HENRIETTA STRALEY, RESPONDENT, v. JOHN STRALEY, APPELLANT.*

Kansas City Court of Appeals.  June 27, 1927.

*Corpus Juris-Cyc References: Divorce, 19CJ, section 219, p. 93, n. 78; section 331, p. 125, n. 92; section 367, p. 142, n. 52.

*Fred W. Klaber, James H. Anderson* and *J. B. McGilvray* for respondent.

*Sebree, Jost & Sebree* and *M. M. Bogie* for appellant.

BLAND, J.—This is a suit for divorce. The court granted plaintiff a divorce and the custody of the minor child born of the marriage, gave defendant the privilege of seeing the child on stated occasions and adjudged that defendant pay plaintiff $30 per month for the support and maintenance of the child. Defendant has appealed.

The facts show that defendant first met plaintiff on July 1, 1918, while he was in France in the service of the United States Post Office Department during the late war. On the day mentioned he went to board with plaintiff's mother, Madame Creasy. Plaintiff and her mother resided together; they were French women, the former being the only child of the latter. When he met plaintiff she was introduced to him under the name of Mademoiselle Creasy, indicating that she was a single woman. Before long he began paying court to her, culminating in his proposing marriage. Plaintiff then for the first time told him that she was not free to marry; that she had a husband from whom she was separated; that her husband had filed a suit for divorce from her in 1913 but that the trial had been delayed on account of the war; that she was opposed on religious grounds to the divorce but had been willing to consent to a separation. However, after defendant proposed to her she was willing to be divorced in order to marry him and they agreed to be married when the divorce was procured. Defendant lived at Madam Creasy's about five or six months and for about two months after he had proposed to plaintiff. He was then transferred to some other part of France but kept in communication with plaintiff. After the war plaintiff's husband came back to France and secured an absolute divorce. During the time her husband was separated from plaintiff he paid her as alimony eighty francs per month. Plaintiff cabled defendant, who was then in this country, of the divorce, resulting in plaintiff and Madam Creasy's coming to New York as had been planned. It had been agreed that Madam Creasy was to live with the parties after their marriage. Defendant met plaintiff and her mother in New York and they were married on June 28, 1920, at Greensburg, Pa., at the home of a friend. After the marriage they came to Kansas City and shortly thereafter defendant purchased a home in that city where the parties and Madam Creasy lived until the separation.

Plaintiff testified that defendant became "grouchy" and mistreated her "right at the beginning of our married life;" that he did not show the interest in her that a husband should. She attributed his lack of interest and affection for her largely to what was disclosed to her by defendant on the day of the marriage. In reference to this, plaintiff testified that defendant told her that "he was very sorry for me, that he was not like other men;" that "he had a kind of paralysis" and for several years had spent money trying to cure his condition and had improved. She testified that customarily he had difficulty in effecting his desire to have sexual intercourse with her; that during the first year he was successful in his efforts in this respect about once a month; that her child, a daughter, was born between nine and ten months after the marriage; that he ceased to have intercourse with her two months before the child was born and resumed such relation about four months afterwards; that he quit having sexual intercourse with her entirely about six or eight months after the child was born. She testified that they had no trouble the first year but had their first difficulty in the year 1921; that at that time she had found some obscene postal cards in defendant's trunk and had burned them because she was expecting a child to be born and did not want the child to see them as she did not think they were fit for a child to look upon; that she told her husband that she had destroyed the cards and he became angry and struck her with his fist; that she did not remember the second time he struck her but that he struck her in the year 1922 very often; that she never struck back at him; that at one time when defendant was playing with the baby she thought he was not sufficiently clothed and asked him "to be more decent" in front of the child and for this he struck her. She testified that she never struck defendant but that she defended herself once or twice by pushing him away; that she never refused to permit him to have intercourse with her or to caress her; that he did not ask her and she did not think it her place to ask him; that "if he would talk to me it would never be pleasant, he would call me a bitch or something like that . . . dirty, filthy bitch;" that after the baby was born her husband procured something from the drug store for plaintiff to use to prevent conception; that in the spring of 1922 she ceased sleeping with her husband and moved downstairs into the dining room where she continued to sleep and never again slept with or "cohabited" with him because "he did not ask me to;" that—

"For ten months I lived with my husband in the same bed like brother and sister and my husband never said a word of affection to me and never asked me anything, and I felt summer was coming and we were burning up, we have no attic to the house and our room is very warm. I felt my little daughter was suffering too

much and I was not of any use to my husband, so I decided to come downstairs.

"I never wanted my husband to give up his room upstairs and move downstairs, that is, I never did say that to him."

That defendant brought the bed downstairs and she never went back upstairs because he did not ask her to.

During their married life defendant was employed at the post office in Kansas City and received a salary of $150 per month, $140 of which he turned over to his wife for the purpose of running the household and making payments upon the house. Plaintiff testified that in July, 1923, she complained to the Board of Public Welfare because he had refused to give her any money one month and the grocer, butcher, milkman, etc., had refused to make any more deliveries of food on account of the fact that they were not paid; that she asked defendant a number of times for the money and he would not answer her or even tell her that he would not give it to her, so she finally went to the Welfare Board for help; that the agent of the Welfare Board sent for defendant; that plaintiff and defendant met there and defendant stated to the agent that the reason he refused to give his wife money was because she would not "cohabit" with him; that she asked defendant if he had ever asked her to have sexual intercourse with her and at first he did not answer but that afterwards said he had not; that defendant admitted during the interview that he had struck her; that the agent of the Welfare Board advised them to go back home and begin married life anew; that they both agreed to do this but defendant never thereafter asked her to have sexual intercourse with him and she went back to the agent and inquired of him "if in America it was the way for a woman to ask her husband" and the agent replied, "No." At another place in her testimony she stated that she went to the Welfare Board after defendant had refused to give her one-half of his salary and that it was impossible for her to get along with one-half of it and pay the bills and that she refused the one-half of it because he would not give it all to her.

Plaintiff testified that the evening after she returned home from the meeting at the Welfare Board, after supper, she went upstairs and told defendant goodnight as he had requested her to do, but that he was reading and would not look at her; that she continued this for about a week but that "he would not say a kind word to me or look at me;" that she then thought she could say goodnight as well downstairs and "I didn't do it any more and he did not ask me to do so;" that after the meeting at the Welfare Board defendant's treatment of her was worse and he struck her more often; that he would not answer when she talked to him; that he would not take her to places of amusement and had taken her to a picture show but twice in four and a-half years.

The trial was had on February 9, 1925, and plaintiff testified that during the "past three years" we have not talked to each other at all because I got tired of talking and never having an answer;" that defendant would "talk more in front of somebody else." At one place in her testimony she stated that after the meeting at the Welfare Board "he did not speak;" that after this meeting in July, 1923, defendant gave her $50 a month, out of which she had to pay all the bills except the payments on the house, the electricity and water; that defendant would not fix anything about the house; that she began teaching French at the Sunset High School in February, 1922, and it became necessary for her to pay some of the household expenses out of her salary; that during the first year of her teaching she received $50 per month and afterwards $100 per month salary; that she also obtained work in tutoring during the summer holidays for which she charged $2 per hour. She testified that during the last year they lived together defendant stayed out late at night two or three times a week—"Before I went to the City Hall he was staying out at night very often. He began in 1923 two or three times a week, sometimes until three or four o'clock in the morning, and three times he came home the next day. He didn't tell me where he had been. During the last year he did not stay out so often."

The last quarrel occurred on September 28, 1924. According to plaintiff's testimony at this time defendant was playing with the baby and the child vomited on him, the floor and upon itself and he called to plaintiff; that she took a towel and cleaned the child's clothes but did not clean defendant's clothes; that this made him very angry and he began throwing things on the floor and struck her on the shoulder, arms, face, and kicked her on the leg; that plaintiff's mother threatened to call the police and defendant pushed the mother so hard that he knocked the breath out of her and she fell against the stove and pushed it out of place; that plaintiff then called the police and defendant went upstairs. One of the officers testified that when he arrived defendant gave his version of the affair and told the officer that he had struck his wife. The officer found the stove had been knocked to one side and the mother sitting in a chair crying. Another officer testified that defendant told him that they had had a "little spat." When asked why he wanted to hurt his wife, defendant replied he was "mad." This officer testified that they went into the kitchen and found that the stove was knocked loose from the wall and chairs were upside down; that there were some bruises on plaintiff's arm and she was crying; that defendant said that he had not struck the "old lady" but had pushed her. There was other evidence that a doctor was called and found that Madam Creasy was bruised in two or three places from

her hip down; that she was confined to her bed about ten days. A few days after this occurrence plaintiff brought this suit.

Plaintiff's testimony in regard to her mistreatment by defendant was corroborated by her mother, including the striking by defendant of his wife, and the calling her names. Madam Creasy testified that one of the main causes of the trouble was defendant's treatment of the baby; that he insisted on kissing her in the mouth when he had catarrh, against the advice of the doctor; that plaintiff did not want defendant to kiss the child in the mouth; that plaintiff did not do this herself; that "French people do not believe in kissing children on the mouth." There was other testimony that defendant was sullen and would not talk in the presence of his wife and testimony on the part of two other witnesses that defendant had admitted to them that he had struck his wife on one occasion and was sorry for it.

Defendant testified that he was forty-five years of age; that he was not disabled in any respect from having sexual intercourse and indulged in this frequently with his wife until after the child was born, after which she did not want to have another child "right away" and solicited him to get something to prevent conception. He denied that he had the conversation she testified as having occurred on the day of their marriage. He testified that his mother-in-law insisted on running the house and while he turned over all of his salary to his wife, she did not take him into consideration in reference to anything and treated him with indifference; that this conduct on her part began immediately; that she first became angry with him in New York because they had some discussion in regard to the fact that negroes were treated with greater consideration in France than in this country; that he told her to wait until she understood more about conditions in this country before they would talk about it and she became angry and did not get in a good humor until they arrived in Greensburg, which was three or four days after she arrived at New York; that his wife continually nagged at him about little things; that she was never in a good humor and after the baby was born she seemed to be angry with him all of the time; that she would be in bed half of the time when he came home from work; that when they would go to bed she was "unapproachable" and often after they retired she would not permit him to put his hands upon her or touch her; that this conduct continued until the time she began to sleep downstairs; that he did not suggest that she move downstairs but that she bought a bed and placed it in the dining room without consulting him; that he objected to her sleeping downstairs; that she returned to the upstairs for a few nights but went back to sleeping downstairs and that he was never able to persuade her to come back although he had requested her often to do so; that he would kiss her and caress her but that she refused to

respond and to show him any affection; that he never had intercourse with her after she moved downstairs.

Defendant further testified that she quarreled with him about money matters and in the summer of 1923 in such a quarrel she tried to take some money away from him and he refused to give it up and she kicked him and in warding off her blows he accidentally struck her and immediately afterwards apologized for it; that this was the only time that he struck her; that during this quarrel she continued to beat him until he was exhausted and that he buried his face in the baby's lap and she jerked the baby from underneath his face; that the next day he told his wife that he was through until she was ready to "cut out all this rough stuff;" that he did not come home for three days and that she finally came to where he was working and said that the baby had to have some underclothes; that he gave her $20; that he cooled off and went home and attempted to give her the balance of his salary, but she refused it and complained to the Board of Public Welfare; that at the meeting at the Board they agreed to go back and begin life anew but that night she re-fused to move upstairs and although he repeatedly asked her to come back, she refused to come; that on several occasions his wife struck him with her fists; that she refused to let him have anything to do with the baby and struck him with her fist when he took the baby up in his arms at one time; that his wife and mother would speak in French and would leave him out of the conversation.

In reference to the trouble on September 28, 1927, he testified that he went into the kitchen to clean his clothes after the baby had vomited and his wife and mother-in-law tried to prevent him from getting the hot water; that seeing he could not get the water he threw the rag he had on the floor and started upstairs and his wife started after him and got hold of his neck; that he reached up and caught her and pushed her away; then his mother-in-law came up and started to put her hands on him and he said to her "keep your hands off" and that he pushed her back and she fell and knocked the stove out of place; that his wife then turned loose of him and started to her mother and he started to go to help his mother-in-law up and his wife was on him "like a tiger;" that he pushed her off, and went upstairs and heard her call the police. He denied ever calling his wife names, and testified that he was never away from home all night but two nights as far as he could remember and on each of these occasions he stayed at his sister's house in order to get an early start the next morning on a fishing trip with his brother-in-law and sister; that once a week he went alone to his sister's for supper and that her house was quite a long distance away and he would get home quite late.

Plaintiff and her mother, being French, apparently confined their acquaintances in Kansas City to French people; they were very

friendly with the Bergdoffer family who also were French, and through these people they met a Mr. Rau, a French Swiss, who was born in France. Rau was a single man without relatives in this country and was operating a greenhouse in Kansas City. He was around thirty-five or thirty-six years of age, about the same age as plaintiff. Plaintiff met Rau about the first of July, 1924, at the latter's greenhouse. This was on Sunday evening. Plaintiff testified that she had gone to make a visit with the Bergdoffers who told her they had an appointment to meet a Mr. Rau at his greenhouse and when plaintiff wanted to leave they insisted that she go along with them. Rau was living with a Mr. and Mrs. Kupfer at or near the greenhouse. Kupfer being in business with Rau. Plaintiff testified that she saw Rau again the next Sunday when the Kupfer family had invited her and her mother to go with them on a picnic; that at this picnic there were twenty or twenty-five people present; that she did not remember when she saw Rau again but that it was at Mrs. Bergdoffer's about a week or two after the picnic; that she would talk with Rau when he was in her company; that the first time he came to her house was in August about three o'clock in the afternoon; that her husband was at work; that Rau called once or twice in August, called to visit her mother and herself; that she did not remember when he came again but that he was not a regular caller; that the better he knew her mother the more he liked to talk to her as he had a mother, sister and brother living in France; that she did not get home from school until about 4:30 and sometimes had private classes detaining her longer; that in March, 1924, she purchased an Overland touring car, agreeing to pay for it in installments; that she made the payments out of her earnings. She testified that she went on an automobile trip with the Bergdoffer family to St. Joseph in her car and that Rau went along; that on one occasion she, Rau and Mr. and Mrs. Bergdoffer went to Excelsior Springs and that she had the Bergdoffers and Rau to Thanksgiving dinner in 1924; that Rau cut wood for the furnace in the basement for her mother and one evening fixed a lock on a door for her and that at one time he bought automobile chains for plaintiff's car; that he coaled the furnace when he was in the house and that he brought some flowers but she did not know whether for herself or her mother; that they talked French most of the time; that he never made love to her and, "Q. Did you make love to him? A. I don't think so. Q. I want to know whether you did or not. A. Well, no." She testified that she talked to Rau about these divorce proceedings after they were instituted "because everybody else was talking about it." "Q. What did you tell him you were going to do after you got the divorce? A. I didn't have anything to say about it— I wished I was able to take care of my child." She testified that she talked many times to Rau over the telephone but very often she

was calling the Kupfers and Rau sometimes would answer the telephone; that he did not bring her flowers very often, "maybe three or four times;" that he brought buds and flowers, that could not be sold, to her mother to be fed to the chickens. When asked if she told her husband about Rau's being at the house she stated—"My husband never did talk to me and one time I asked Mr. Rau to wait for my husband, that he would come home soon, and my husband never did come. He waited for a while but my husband didn't come." She testified that on one occasion defendant met Rau at her house; that at Christmas, 1924, the Bergdoffers were giving a Christmas tree for her child and she knew and Rau knew that both of them would be there so she "told our lawyers and asked them what to do" about attending and they told her that it would be all right for her to attend. She further testified—

"Q. Did Mr. Straley know that Mr. Rau was coming to your house before you separated? A. I don't know. For a long time my husband never would talk to me.

"Q. How long was it he wouldn't talk to you? A. Since we were at the Welfare Board my husband never talked to me.

"Q. He never talked to you at all? A. Never talked to me."

She testified that it was not very far out of Rau's way when he was en route from his place of business to down town for him to come by her house; that she never went riding with Rau unless there was somebody else in the car; that—"I never went with Mr. Rau at any time or place alone. If he came to my house my mother was always there. I was not always at home when Mr. Rau called. I was not always there. Very often Mr. Rau brought flowers in the morning and in the morning I was always working."

Mr. Bergdoffer, testifying for plaintiff, stated that Rau was his best friend in Kansas City and was at his house frequently, that "my wife and I have been out with him and also with he and Mrs. Straley;" that—"I remember taking a trip with them to St. Joe. We went to a picnic. I remember of making a trip with them to Excelsior Springs. Mr. Rau and Mrs. Straley were not alone at any time during the trip." He further testified that they went to Excelsior Springs in his Ford sedan and to St. Joe on the street car; that—"We never went to St. Joe in Mrs. Straley's car. We never go to St. Joe in the car, we go to Excelsior Springs. We have two cars, her car and my car. We did not have room enough in one car, my wife and me and little boy, the lady, a lady I don't remember, because Mr. Rau drove her car himself, she don't drive very good. My wife was in the car with me and her mother and the time we went to St. Joe was on a street car. When we went to Lawrence we went alone. I don't remember whether we went to Topeka, Kansas, or not. Besides going to Excelsior Springs in the automobile we

also went one time to Swope Park and made a little picnic. We liked to get fresh air when it was so hot. We took these automobile trips when it was so hot every night. Sometimes it is a nice night. Sometimes Mrs. Straley drives her car herself, but not very often. And Mr. Rau would drive it for her.''

Madam Creasy testified that Rau never went with plaintiff; that he came to visit the witness and did not come to visit plaintiff because very often he came when the witness was alone; that he was very kind to the witness and at the time he put the lock on, plaintiff was away and when he did work at the house it was done at the request of the witness; that she and plaintiff did not often go to Rau's greenhouse and that she accompanied plaintiff to the greenhouse when they first met Rau; that she had been there at the greenhouse two or three times in the daytime; that she could not tell how many times Rau had been at plaintiff's home when plaintiff was there; that he usually came, "sometimes once a week, sometimes three times and sometimes she was not there and sometimes she was there.'' That "he used to stay a long time because he talked about his mother who was in France and my son;'' that they would talk about France "the most;'' that sometimes he would stay two or three hours but plaintiff was very often out; that defendant "came home one time when Mr. Rau was at the door and Mrs. Straley introduced Mr. Rau to her husband. I don't think that she told Mr. Straley what Mr. Rau's business was. As far as I know Mrs. Straley has never been alone with Mr. Rau. When they went out together she always goes with Mr. and Mrs. Bergdoffer, and the little son or boy, sixteen years old, and the baby and I. Mr. Bergdoffer is a great friend of Mr. Rau. I know because she never goes out without me. I always know where she goes.''

Mrs. Bergdoffer testified that she remembered taking the trip to Excelsior Springs when Rau and plaintiff were along; that Madam Creasy and plaintiff and Rau, plaintiff's daughter, and the witness were in the car together; that they went to St. Joe in the street car; that she was with plaintiff all the time and that the latter was not alone with Rau on these trips; that after she introduced plaintiff to Rau at the latter's greenhouse he and Mrs. Straley met a number of times at her house, that—"It was not on every occasion that Mr. Rau came to my house that Mrs. Straley came too, but on many occasions. When we went over to Excelsior Springs, Mrs. Straley and Mr. Rau rode in the front seat of the car and Mrs. Creasy and the baby and I in the back seat and Mr. Rau drove the car. We had a picnic over there, I don't remember how long we were there. Mr. Rau was around with Mrs. Straley during the picnic just the same as me and everybody, and at St. Joe the same way. Mr. Rau was not in the same street car that Mrs. Straley went to St. Joe in. I was down at Mrs. Straley's house Thanksgiving Day, Mr. Rau was

there, Mrs. Straley gave a dinner for Thanksgiving Day to Mr. Rau, my husband and myself. We were there until 8 or 10 o'clock in the evening. Mr. Rau left the same time we did. I don't remember about Mr. Rau being at the Straley house any other time. He was at my house Christmas. We made a Christmas tree for Mrs. Straley's little girl; last time I saw Mrs. Straley and Mr. Rau at my house was Christmas. They were at the dinner and after that Christmas Day. They stayed until 9 or 10 o'clock. They haven't been at my house together since.''

Rau was called as a witness by defendant and testified that he met plaintiff about the first of July, 1924, at his greenhouse; that he saw the Bergdoffers and plaintiff only a few minutes at this meeting; that he saw plaintiff the following Sunday at his greenhouse as they had arranged for a basket picnic there for that day; that he saw her again a week or so afterwards at Mrs. Bergdoffer's house; that he went there to be treated by Mr. Bergdoffer who was a masseur; that he did not recall how often he had seen plaintiff at the Bergdoffer's house; that he went for a treatment two or three times a week and at times plaintiff would come there; that this meeting was not by appointment or design; that he met her at the Bergdoffers five or six times during the summer of 1924; that he had heard Bergdoffer advise plaintiff to buy chains for her car and that afterwards the witness volunteered to buy the chains; that when he delivered the chains it was the first time that he was at plaintiff's house; that plaintiff's mother and the child and plaintiff were there; that he was there two or three hours and it was three or four weeks before he went back; that he talked to plaintiff four or five times over the telephone before her mother got hurt on September 28th; that Mrs. Kupfer invited plaintiff and her mother to supper which he and they attended; that plaintiff never came to the greenhouse alone; that he had seen her four or five times prior to going to St. Joseph with her; that he talked with her and visited with her when in her company; that between the St. Joseph and Excelsior Springs trips he saw her three or four times at Mrs. Bergdoffer's house; that either Madam Creasy or Mrs. Berghoffer arranged the trip to Excelsior Springs and that it was not understood that he was to drive plaintiff's car but he did so because she was afraid to drive it on the narrow road.

He further testified that he went to plaintiff's house three or four times up to September 2nd; that he met plaintiff at other times at Mrs. Bergdoffer's, that he visited the Straley home five or six times; that he delivered some discarded buds and carnations to the Straley house for the chickens; that he gave plaintiff flowers a few times; that plaintiff was not always at home when he was there but that she was there about half the time and when she was not

there he did not wait for her; that he did not know how many telephone conversations he had had with her during the month of October; that plaintiff and Mrs. Kupfer would call each other and sometimes he happened to answer the telephone when plaintiff called up and "I called her up too, I can't say how often I did call her up, I called her up a number of times and talked to her;" that he did not remember how many times he had been at plaintiff's house during the month of November, 1924, but did remember being there for Thanksgiving dinner; that during December he fixed an electric socket for plaintiff in her house and also put a lock on the door at plaintiff's request; that—

"When I visited Mrs. Straley I would park my car sometimes in front of the house and sometimes when the weather got cold I would put it at the corner down hill where it was easy started. I usually parked the car right down below on the corner, and always in front of a vacant lot. That was just around the corner cater-cornered from the house and once or twice I left it on Woodland avenue. I stopped it going down town so I wouldn't have to turn around. That is, one block from the house. I was not a sort of shopping agent for Mrs. Straley. I always made friends with French people and if they asked me to do them a favor I am glad to do it. I didn't shop down town very often for Mrs. Straley. Mostly for her car. She didn't know where to get things."

Plaintiff lived on Michigan avenue, which is parallel to Woodland avenue. Rau further testified that plaintiff always paid him for the things he purchased for her; that he had split kindling for her in the basement twice and nailed some boards on the chicken house; that he changed an elbow in the furnace and fixed it; that Madam Creasy remained in the same room with plaintiff and the witness when he was there; that plaintiff would get up and go out at times but Madam Creasy always stayed in the room; that some third person was always present when he was in the company of plaintiff; that he never thought of doing anything wrong that "I thought it was all right going to her house to see her and calling her over the phone. I still think it was all right." He testified that he and plaintiff obtained the advice of her attorney before they attended the Christmas dinner: that during the summer of 1924, Mr. and Mrs. Berghoffer and the witness and plaintiff had been out riding in the Bergdoffer car and when they took plaintiff home defendant was sitting on the front porch; that the witness got out of the car and defendant came down to the sidewalk and plaintiff introduced the witness to defendant; that after that he was never at the house again when defendant was there; that he did not know when defendant got home from his work at the post office.

On cross-examination Rau testified that he sometimes went to plaintiff's house at night, "I had to especially when I fixed the

wood and fixed the furnace'' because he had to do this during his spare time; that he did not try to avoid defendant and there had never been any understanding between himself and plaintiff as to a probable marriage; that nothing of the kind had been discussed; that he never made love to plaintiff and plaintiff had never made love to him; that—

''I left my car on Woodland avenue when I went to the Straley house because if you own a Ford it is awful hard to crank, you will park it down hill so it will coast down. There is a hill on Woodland avenue. I didn't try to hide myself. The reason I took things to Mrs. Straley and her mother is I always like to meet French people and make friends with them. I haven't no other people in this country. I am always glad to meet them. I would leave my car in front of her house except in cold weather, was when I didn't do it.

''Q. Then when you left your car on the other block you say you left it for the purpose of starting it easily on account of the cold weather; I will ask you if you recall any cold weather in October, November, or September at the times you stopped in front of the vacant lot? A. It wouldn't be cold weather; I mean the motor was cooled off. My car is a 1921 and is always hard to start.''

Defendant testified that he never met Rau at his house but that he met him in front of the house on the sidewalk at one time; that at the time he met Rau was on the occasion testified to by Rau; that he did not know before the petition for divorce was filed that Rau had been coming to his house; that he received information that someone was going to his house and made inquiry and discovered who it was. Defendant further testified that he was at work at the post office every day except Saturday and Monday, from 10:00 A. M. to 6:30 P. M. and on Saturday and Monday from 10:30 A. M. to 7:30 P. M., and that it took him about forty-five minutes to get home from his work; that he always got home about the same time except once a week when he went to his sister's house; that during the summer of 1924 when he would get home at night, invariably his wife would not be there; that she was not at home any time after the 4th of July until about the 11th of September when he would arrive home from work; that she would come in anywhere from 9:00 to 11:00 P. M.; that she had the baby with her and also her mother and would be driving in her car. He testified that in November, 1924, he asked his wife if there was any use to talk ''these matters over'' and she insisted that he talk to her lawyers; that he talked to her because he did not want her to get a divorce; that when he returned the baby to her shortly before the trial he attempted a reconciliation but she refused. Plaintiff testified that when defendant returned the child to her shortly before the trial, he mentioned something in a half-hearted way about a reconciliation

but she said to him, "I told him that after trying to blacken me I would not do it;" that in saying this she had reference to some accusations he had made against her concerning Rau's "coming to make love to me."

Defendant insists that this being a divorce case we are required to examine the testimony and come to our own conclusion; that the evidence shows that plaintiff did not make out a case for divorce and in this connection defendant discusses the weight of the testimony. The trial court was in a more favorable position than we to pass upon the weight of the testimony as he heard and saw the witnesses, and we are not disposed to disagree with him in his conclusion that plaintiff made out a case. There was much evidence that defendant struck plaintiff without excuse on several occasions; these indignities alone were sufficient to establish a cause of action against the defendant if believed by the court.

However, it is well settled that—"The burden was on the plaintiff not only to prove the marital misconduct of the defendant, but also show affirmatively that he was not only the injured, but the innocent, party." [Ellebrecht v. Ellebrecht, 243 S. W. 209, 210.]

We do not think that plaintiff has shown that she is an injured party and we base this conclusion on testimony more or less uncontroverted. Plaintiff testified that she had little or no communication with her husband. Her social relations with her husband were not pleasant and, naturally, she sought companionship elsewhere and there can be no cause for complaint that she sought it among her own countrymen, as this was but natural. Yet her relationship with Rau was not such as an innocent wife should have carried on unknown to her husband. While defendant did not produce any testimony of any immoral conduct of a sexual nature between the two, the evidence shows that Rau came to plaintiff's house to visit her, sent her flowers, called her up over the telephone, drove her car, was handy-man around the house, etc. They were even fearful that there might be some criticism if he attended the Christmas tree celebration for her child and they both asked her attorneys for their advice in regard to this. This shows that they did not underestimate the situation. Her conduct may not have amounted to an indignity toward defendant if she had advised him of her association with Rau but she at no time did this, giving as an excuse that defendant would not talk to her. Defendant testified that they talked a number of times on various subjects and the evidence shows that they were able to quarrel on occasion. It it fair to assume that there was communication of some kind had between them. It is a matter of surprise that some word was not spoken at least between plaintiff and her mother in defendant's presence in reference to Rau's visits even though their conversation was not at all

times carried on in English in his presence. Madame Creasy testified that she and plaintiff would talk English in the presence of defendant so he could understand. At any rate there was no occasion for plaintiff not acquainting her husband with her rather intimate acquaintance with Rau. One very significant circumstance is plaintiff's testimony that she asked Rau to stay and meet her husband on one occasion. This shows that she realized that this was the proper thing for her to do but she never thereafter undertook to bring about such a meeting or to tell her husband about Rau's calling at the house and her acquaintance with him.

It seems that defendant met Rau merely through an accident. Rau was not calling but the Bergdoffers brought plaintiff home one evening when defendant was sitting on the front porch. Rau was in the car and it was but natural that some introduction would take place at that time but no explanation or statement was made by plaintiff at that time as to who Rau was or her connection with him. In this connection it is remarkable that Rau did not make any of his calls at the Straley home at any time when defendant was present. Of course, all the testimony in respect to the relationship between plaintiff and Rau comes from plaintiff's witnesses and her friends, who seemed to show a disposition to construe their conduct in an innocent way, and plaintiff and her mother would leave the impression that he was coming to see the mother as much as plaintiff. But giving full force to all the testimony to the effect that there was always some third party present at the time plaintiff and Rau were in each other's company, there is much in the record showing that Rau's interest was by no means wholly centered in the mother. Plaintiff seems to regard it her privilege to go with other men while married. She did this with her first husband. As before stated, while there is no testimony as to any immoral relation had between plaintiff and Rau, we do not think that plaintiff has conducted herself as an innocent party within the meaning of the law and is not entitled to a divorce. While the answer consisted merely of a general denial, the case was tried as though recrimination were pleaded and it is unnecessary for us to pass upon the question as to whether recrimination should ordinarily be pleaded.

The judgment is reversed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.