Geraldine E. BUETTMANN, Plaintiff-Appellant-Respondent,

v.

Raymond J. BUETTMANN, Defendant-Respondent-Appellant.

Nos. 33283, 33284.

St. Louis Court of Appeals, Missouri.

Feb. 23, 1971.

Motion for Rehearing or for Transfer to Supreme Court Denied March 23, 1971.

Application to Transfer Denied May 10, 1971.

Newmark & Baris, St. Louis, for plaintiff-appellant-respondent.

Ackerman, Schiller & Schwartz by Theodore F. Schwartz, Clayton, for defendant-respondent-appellant.

CLEMENS, Commissioner.

The trial court denied both the plaintiff-wife's petition for divorce and the defendant-husband's crossbill for divorce. Both appealed. We note the scope of our review. Under Civil Rule 73.01, V.A.M.R., we review the case on both the law and the evidence, making our findings of fact but giving regard to the trial court's better opportunity to judge the credibility of witnesses, and we may reverse only if the decree is clearly erroneous.

For either party to be entitled to a divorce that party must be innocent, that is, free of conduct which would entitle the other to a divorce. Day v. Day, Mo.App., 433 S.W.2d 52 [1–7]. We examine the evidence to determine each party's innocence, first that of the plaintiff-wife.

The first issue is whether the plaintiff-wife, in view of her association with another man, was an innocent party. Without detailing the testimony, we find these were the facts: Late in 1964, a few months before plaintiff and defendant separated, they formed a close social arrangement with a Mr. and Mrs. Bodimer. They met in each other's homes and frequently bowled together, sometimes as a foursome, sometimes just Mr. Bodimer and the plaintiff-wife, sometimes the defendant-husband and Mrs. Bodimer. Mutual suspicion finally produced mutual surveillance and culminated in a sharp physical encounter between plaintiff and defendant. They separated and this suit was quickly filed. Although defendant apparently ceased associating with Mrs. Bodimer, the plaintiff continued to associate with Mr. Bodimer. The announced reasons for these meetings were their mutual interest in bowling, her helping Mr. Bodimer with his income tax problems, her tutoring his son and his repairing her automobile. They frequently went bowling together, often to out-of-town tournaments. They made other out-of-town trips together, sometimes but not always with others present. Immediately following the parties' separation and while plaintiff's divorce suit was pending it is fairly inferable that Mr. Bodimer was a frequent visitor to plaintiff's home.

Although Mr. Bodimer lived several miles away, 30 some times he parked his car near plaintiff's home late at night; it was often still there in the early morning. This becomes significant in view of Mr. Bodimer's known presence at and near plaintiff's home late at night and early in the morning. On three evenings plaintiff met Mr. Bodimer at his car in the alley behind her house and drove off with him. Twice late at night Mr. Bodimer walked from his parked car toward plaintiff's home and twice in the early morning he walked from plaintiff's home through the alley toward his parked car. Although wrongdoing was denied by both plaintiff and Mr. Bodimer and excuses given for

their frequent meetings, these explanations are not persuasive.

■ The defendant-husband contends this evidence showed adulterous conduct between plaintiff and Mr. Bodimer, citing State v. Hicks, 170 Mo.App. 183, 155 S.W. 482. Plaintiff-wife denies the evidence is sufficient to show adultery, citing Ritter v. Ritter, Mo.App., 394 S.W.2d 78, and Ellebrecht v. Ellebrecht, Mo.App., 243 S.W. 209. We need not decide this precise point since a wife's association with another man, falling short of proven adultery, may warrant the denial of a divorce to her. This, since "through an extension of the maxim that [s]he who seeks equity must come into court with 'clean hands,' our courts have held since an early day that a divorce may be granted only if the party seeking it shows that [s]he is both an injured and an 'innocent' party." J. V. K., Mo.App., 419 S.W.2d 461 [2].

■ We have here a wife's persistent and prolonged association with another man under circumstances affording opportunities for misconduct and giving the husband reasonable cause to suspect marital infidelity. This in itself is a course of conduct constituting indignities against the husband. Comparable extra-marital conduct has been held to bar a divorce to the offending party. See Straley v. Straley, 221 Mo.App. 1136, 298 S.W. 110 [3]; Ferguson v. Ferguson, Mo.App., 279 S.W. 189 [2]; and Herriford v. Herriford, 169 Mo. App. 461, 155 S.W. 855 [1].

We hold that plaintiff-wife has not carried her burden of showing she was an innocent party. The trial court's denial of plaintiff's petition for divorce was not clearly erroneous and will be affirmed.

This result still leaves one point for review on plaintiff's appeal. She contends the trial court erred in failing to allow her attorney fees and costs since she was unable, but the husband was able, to bear those expenses.

Several well-rooted principles guide us in resolving this issue: Whether a wife is guilty or innocent her husband is obliged to furnish her the means of attack or defense if she is without adequate means of her own. McGrath v. McGrath, Mo.App., 387 S.W.2d 239 [2]. The wife carries the burden of showing her inability to meet litigation expenses. Ridgley v. Ridgley, Mo. App., 370 S.W.2d 679 [8]. The test is whether the wife has sufficient means which she may reasonably be required to use in prosecuting the suit. Baer v. Baer, Mo.App., 51 S.W.2d 873 [13–15]; Graves v. Wooden, Mo.App., 291 S.W.2d 665 [12–15]. This fact issue is addressed initially to the trial court's discretion and appellate courts will reverse only when that discretion has been abused. Keefe v. Keefe, Mo., 435 S.W.2d 313 [6, 7]; S⸺ v. G⸺, Mo.App., 298 S.W.2d 67 [21, 22].

■ Without detailing the somewhat vague testimony of plaintiff's financial ability we find these were the facts: The plaintiff netted about $650 a year doing income tax return work. The defendant was a carpenter earning over $200 a week. Until they separated the defendant always turned his paycheck over to plaintiff and she invested what was not needed for family expenses. When they separated there was about $15,000 in savings; plaintiff and defendant divided this equally. The parties lived in the $10,000-value home of plaintiff's grandmother who had placed the title in joint tenancy with the plaintiff. Plaintiff and her grandmother also had invested $5,000 of accumulated savings in bonds registered in their joint names. At trial time plaintiff had $9,300 on deposit in similar joint savings accounts. During the four years before trial time the plaintiff bought and sold stocks through a broker, registering them in her and her grandmother's names. The broker's records showed some $6,400 worth of stock was still so owned. The value of these liquid items exceeds $20,000.

From all this we conclude plaintiff had sufficient means which she was reasonably

able to use to pay her own expenses of litigation. Plaintiff seeks to avoid this by contending most of her assets were held jointly with her grandmother. She cites Price v. Price, Mo.App., 281 S.W.2d 307, l.c. 313, and Mathews v. Mathews, Mo. App., 337 S.W.2d 529, l.c. 535–536. Those cases speak of a wife's available assets as being owned "individually" and means "of her own." Neither case speaks of assets held jointly by the wife and another person; in context, the quoted words were used merely to describe assets that were available to the wife. The plaintiff has failed to show the jointly-held assets were unavailable to her to the extent of paying her own litigation expenses. In law, all were available to her as a joint tenant; in equity they were substantially available to her. The trial court did not abuse its discretion in denying plaintiff an allowance for costs of litigation.

As noted, the trial court also denied defendant's crossbill for divorce. Since the evidence showed the plaintiff-wife was not an innocent party, she having committed indignities against him, he would be entitled to a divorce if—but only if—he was free of conduct toward his wife rising to the level of indignities. Without reciting the testimony we find the following to be facts about the husband's conduct.

The plaintiff, defendant and their three children lived with her elderly grandmother in the grandmother's five-room house; the parties and their children shared two bedrooms. Defendant refused to provide the family a home of their own, which they could well afford, and this produced many quarrels. Plaintiff had to assume the children's discipline, defendant failing to give her full support in this, causing further quarrels. The defendant, without cause until the last few months of the marriage, distrusted the plaintiff, accused her of associating with other men and often demanded detailed explanations about her activities when away from him. These problems about the home, the children's discipline and the defendant's jealousy combined to cause continued strife. This caused plaintiff to become nervous, causing her to resort to psychiatric treatment.

Other parts of the evidence concerned pornography. The defendant subscribed to pornographic publications and regularly received photographs, some original, of unclad men and women and even animals, engaged in sodomy and abnormal sexual intercourse. He received and kept advertisements for mechanical sexual devices. He carried a novelty key chain on which an object when spun depicted on one side a nude couple engaged in sexual intercourse and on the other side showed them engaged in sodomy. In plaintiff's presence the defendant often displayed these pornographic objects to acquaintances, most often to men but at times to women. Over plaintiff's objections the defendant stored these items in a dresser drawer, to which the family had easy access; when his wife hid them he found and replaced them. On at least one occasion a daughter and on another a neighbor woman saw the defendant's collection of pornography.

As related in our discussion of the plaintiff's appeal, just before the separation she and the defendant became close social friends of Mr. and Mrs. Bodimer. The two couples began bowling together, but finally the defendant, with plaintiff's acquiescence, began bowling just with Mrs. Bodimer. They did "moonlight bowling" where mixed couples bowled from 10:30 P.M. to midnight. On several occasions defendant and Mrs. Bodimer left the bowling alley at midnight and he did not get home for several hours. The defendant admitted that on two occasions he had kissed Mrs. Bodimer when they were alone, once in his car and once in the kitchen of the Buettmann home.

Plaintiff and defendant fought physically in June of 1965, just before their separation. After an argument and a preliminary scuffle the plaintiff locked herself in a bedroom; defendant broke in and another scuffle followed. Plaintiff bit defend-

ant's hand and he struck her with his fist; her nose bled and both eyes were blackened. When plaintiff tried to call the police defendant pulled out the phone wires.

After this altercation the parties separated and defendant soon began associating with a Mrs. Levindoski, a divorcee who worked at the bar of a bowling alley defendant frequented. He drank with her there at the bar, once drove her home, and was at her home five or six times. We have considered that the defendant's association with Mrs. Levindoski may have been provoked by the parties' separation and plaintiff's persistent association with Mr. Bodimer.

■ Countless opinions have stated the broad rule for determining marital fault. As an example we adopt the statement in Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426 [2, 3]: "While each divorce action based on alleged general indignities must be determined on its own facts, the courts have said repeatedly that indignities, such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. (Citing cases.)"

■ The challenged conduct of the parties was not simultaneous. That of the wife occurred just before and in the few months after the parties' separation in 1965; that of the husband began early in the marriage. To determine defendant's status as an innocent party we must answer the question: Had it not been for her own misconduct would the wife be entitled to a divorce? Bearing in mind our duty to defer to the trial court on questions of credibility and our duty to affirm absent clear error, we conclude the evidence related above showed a course of conduct by the husband that amounted to a species of mental cruelty that rendered the wife's condition intolerable and was subversive of the family relationship. The defendant-husband was not an innocent party, and the trial court did not err in denying his crossbill for divorce.

■ The defendant-husband further contends the trial court erred in denying his prayer for child custody. Since there was no separate count in equity seeking child custody and no divorce was granted, the court did not err in failing to grant child custody. Klenk v. Klenk, Mo.App., 282 S.W. 153; Struttmann v. Struttmann, 463 S.W.2d 600, handed down by this court January 26, 1971; and compare Hugeback v. Hugeback, Mo.App., 444 S.W.2d 23, l.c. 24.

Judgment affirmed.

PER CURIAM:

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, the judgment is affirmed.

BRADY, P. J., and DOWD and WOLFE, JJ., concur.