257 S.W.2d 189 (1953)
MONTGOMERY
v.
MONTGOMERY.
No. 28618.
St. Louis Court of Appeals. Missouri.
April 21, 1953.
Motions for Rehearing Denied May 15, 1953.
Henry S. Caulfield and Daniel Bartlett, St. Louis, for appellant.
Green, Hennings, Henry & Evans, St. Louis, for respondent.
Motions for Rehearing and to Transfer Cause to Supreme Court Denied May 15, 1953.
ANDERSON, Judge.
This is an appeal by defendant, Wiley Pope Montgomery, from an order of the Circuit Court overruling defendant's motion to modify a decree of divorce with respect to the custody of a minor child, and sustaining the motion filed by plaintiff, Delores S. Montgomery, to increase the monthly payments for support of said child.
Plaintiff obtained a decree of divorce from defendant in the Circuit Court of St. Louis County on December 2, 1949. In the petition in said suit plaintiff charged as grounds for divorce that for several years the defendant had treated her "and their *190 minor child with indifference, showing to plaintiff no love and affection," and that defendant was of a quarrelsome disposition and continually nagged plaintiff about "plaintiff's and the household expenses. That defendant's continual attitude and nagging has seriously affected plaintiff's health."
The prayer of said petition was for divorce and custody of the parties' four year old child, Galen, together with an order on defendant to pay a sum sufficient for the support, education and maintenance of said minor child, and a sum sufficient for the support of plaintiff.
The answer of defendant admitted the allegations of the petition with respect to the marriage, the birth and age of the child, but denied all other allegations.
The trial resulted in a decree which dissolved the bonds of matrimony existing between the parties and awarded the custody of said child to plaintiff, subject to the right of defendant to have the custody of said child at reasonable times and to have said child for one month in the summer. The decree also ordered defendant to pay to plaintiff the sum of $75 per month for the support of the child, and accorded the parties the right to remove said child from the State of Missouri, in accordance with a stipulation filed in said cause.
As part of a property settlement between the parties, plaintiff received from defendant the sum of $14,000.
On December 5, 1951, plaintiff filed her motion to modify the decree by increasing the allowance for the support, maintenance and education of said minor child to $175 per month. As a basis of said motion, it was alleged that "the cost of maintaining, caring for and educating said minor child has greatly increased since the decree of divorce and plaintiff is unable to maintain her on the sum of $75 per month; that defendant is earning in excess of $10,000 per year, and is well able to increase the amount of support for said minor child."
By his answer to said motion, defendant denied that the cost of maintenance, etc., had greatly increased since the date of said decree, and affirmed that plaintiff was able to maintain, care for and educate said child on $75 per month.
At the same time, defendant filed a motion to modify the decree so as to give custody and control of the child to him, and relieve him of his obligation for further payments to the plaintiff for support and maintenance of the child. As grounds for his said motion, it was alleged that:
"(2) Since the entry of said Decree of Divorce, plaintiff has moved to Washington, D. C., and has lived in a small apartment therein. To the best of defendant's information and belief, plaintiff is presently employed or otherwise occupied and is not at home during working hours, and said child is not cared for by plaintiff during such working hours.
"(3) Since the entry of said Decree of Divorce, plaintiff has sent said child to a boarding school in Hockessin, Delaware, said school being over one hundred miles from plaintiff's residence. Defendant contends that a child of tender years cannot receive proper parental care and guidance in a boarding school.
"(4) On October 13, defendant married Miss Marianne J. Jensen, who is twenty-seven years of age and who has had considerable experience in raising and caring for young children, having been one of a family of nine children, and not only having cared for her brothers and sisters, but late in life having cared for her many nieces and nephews. Defendant's wife is ready, able, willing and anxious to give said child loving attention and said child will have proper care and attention by both her father and step-mother.
"(5) Defendant's living quarters are well furnished and adequate, and a separate room is therein available for occupancy by said child for her bedroom. No other person but defendant and his wife live therein, and such living quarters provide adequate shelter and living space for said child.
"(6) Defendant is gainfully employed and is financially able to provide *191 said child with all the necessities of life, and is willing and able to do so."
The two motions to modify were heard together, and the trial resulted in an order, entered May 23, 1952, sustaining plaintiff's motion, and in dismissing that filed by defendant. In said order, the decree was "modified so that plaintiff * * * recover of defendant the sum of $40.00 per week for the support of the minor child, Galen Montgomery, except during the time when said child is visiting the defendant, during the summer vacation; that said defendant have temporary custody of said child during the summer vacation from June 15th to August 20th of each year, and during the Christmas holidays on alternate years from December 23rd to January 2nd of each of said years; that said defendant pay the costs of transportation of said child during said specified times, and to have an adult accompany said child on such trips; that defendant have the right to see and visit said child at all reasonable times and under reasonable circumstances."
Defendant did not file a motion for new trial. Notice of appeal was filed June 20, 1952.
Shortly after the divorce plaintiff moved to Washington, D. C., taking Galen with her. She arrived in Washington the 15th or 16th of December, 1949, and took residence in an apartment for which she pays $78.75 per month rent. In January, 1950, plaintiff was employed as a secretary by a real estate company called the "Ofty Corporation" at a salary of $125 per month. Plaintiff's mother is president and majority stockholder of the Ofty Corporation. Plaintiff still draws salary as a secretary for this company. Her present salary is $159 per month.
At the time of the divorce Galen was four years old. For the first six months after plaintiff moved to Washington she herself took care of the child. Galen was sent to a nursery school for three hours a day during that period.
Plaintiff did not seek other employment during the first six months. She stated: "I was very ill. I was mentally upset. I had been through a divorce, and divorce is a very horrible thing and makes big inroads on people. I had to readjust myself * * and I was in no condition to work the first six months I was divorced and therefore I didn't. * * * I was perfectly able to take care of Galen. I wasn't ill, flat on my back, or anything like that." Thereafter, plaintiff learned she could not live on the income she was receiving and, after taking a course at a secretarial school, decided to go to work. Plaintiff then looked into the school situation, and also into the matter of hiring a maid to take care of the child, and decided that it would be better and cost less to keep the child in a boarding school than to hire a maid. Plaintiff stated that it would cost her $150 per month to have a maid in Washington. Plaintiff testified:
"I went to the Washington School Association to see about a boarding school and they told me of a very good one outside of Wilmington. They said there was nothing very good inside the district, so I went and looked into this school. It is very unique, there is none like it in the United States, in fact in the entire world. They take all children from two and one-half years, all the way through high school; it is co-educational and a great big farm. They live on 250 acres, and they know how to live together and work together. She is living in a child's world there and living with other children that I thought was very necessary for a little girl who is an only child and living in a city, with the city streets and danger of automobiles going to and from school. I knew it would have a lot of benefits that I couldn't give her in the city; learning how to ride horseback and swim, and she has learned how to live with other children so she can become emotionally secure. * *
"Q. Tell us the condition of the child's health and temperament at about the time of the divorce and with respect to how it is today. * * * A. She was upset and very emotionally insecure, very unhappy. She knew I was unhappy and my husband was *192 unhappy. Since the divorce and since her re-adjustment with children at the school she is living in a child's world and has never been sick a day. She is very happy and active and head of her class in school. She comes home and is with me for three and a half I visit her on week ends."
The school in question is known as "Sunny Hills School", and is located in Hockessin, Delaware, approximately one hundred miles from Washington. Plaintiff originally placed her child in the school's summer camp to see if the child liked it. Plaintiff asked defendant at the time to contribute to the expense of the summer camp, but he refused to do so. Plaintiff testified:
"I put her in camp to see how she would do away from me and how she would adjust in a life with other children, in a secure surrounding off the city streets and with other children. I was told she adjusted very fast and better than any child ever had there. * * * and that she worked in and cooperated beautifully with everyone. * * * She loves school. She says, `I have two homes, school and home with you.' * * * I could tell in the six months that I could not go on without going to work and getting an education so I could obtain a good paying job. I knew I would have to have a maid to take care of her while I went to school and then got a job, or else have to find a good place for her to be while I went to school and learned some shorthand and typing, so I could get a good job. * * * Galen was not insecure with me, it was not that at all. But I believed instead of paying money to have some colored woman take care of her, the child would benefit by being with other children. She is just a little child and * * * I wanted her to have a good young outlook and being an only child well, I don't thing a child is that type unless it is with other children. * * * I made the statement that instead of paying some colored woman to take care of her she would be in school where she would have many more benefits than being with a colored woman until in the afternoon when I would come home; running the streets; out in traffic, and everything would be much better, even if she were very well protected. * * * being as I had to work for financial reasons, I thought school was the best answer. * * * I looked into other schools * * * There are very many day schools, but I would still have to have someone at home when she got home from school in the daytime to be there until I could get home from work."
Further testifying concerning the school, plaintiff testified:
"They take children from two and one-half years through high school. * * * They take care of them from that age on and they are given good care. They live together, they have different houses, but they live in a big community, more or less, a farm of about 250 acres. They grow all their own food and the children are taught to work and to keep their own rooms, and they do all the things around the school to maintain it. * * *
"Q. What is the faculty? * * * A. Every six children have someone with them."
At the time of the trial, Galen had just completed the first grade in school.
Plaintiff further testified that during the three and one-half months that Galen is with her, "We go to the zoo, take walks, go places together, and my mother takes care of her when I am working. I have taken time off from work, taken my vacations at that time so I can be with her, and I have taken off from school to be with her. * * * go on picnics, ride over to Baltimore, different places like that, maybe down to Annapolis."
Plaintiff further testified that when Galen is in school, "I see her every week end, approximately. * * * I drive up to see her with my mother and spend the night, and I spend all day Sunday with her." When asked by the court if she couldn't arrange to have the child stay with her, plaintiff replied: *193 "Yes, I could do that * * *. In fact, I have been considering doing that, or else I have been considering moving to Wilmington * * * and have every week end with her and have her come home at night too."
In further response to the court's questions, plaintiff said that keeping the child at home would cost approximately as much as keeping her at school. She stated she would be compelled to pay a maid at least $150 per month and, in addition, pay for the child's food and clothing. The tuition at the school is $116 per month, and an additional amount is necessary to pay for uniforms for the child and for laundry. There are also extra fees for art classes. Plaintiff estimated the total cost at $150 per month.
In September, 1950, after Galen was placed in boarding school, plaintiff enrolled as a student in a secretarial school in Washington. She attended this school for a period of eight months and, after completing the course, secured a position in a law office. Her starting salary was $225 per month, and her salary was later increased to $250 per month. She held this position for eight months. This employment ceased when the lawyer for whom she worked died. His death occurred about six weeks prior to the hearing in this case. Plaintiff at the time of said hearing had not procured other employment, but had gone back to school for a refresher course. As heretofore stated, plaintiff has been receiving $159 per month as secretary for the Ofty Corporation. She also received, in 1950 and 1951, dividends amounting to $420 from $20,000 worth of stock in the Ofty Corporation, which stock was given to her by her mother. In 1952 plaintiff received the sum of $210 as dividends from said stock. Plaintiff has spent over $7,000 of the $14,000 she received as alimony in gross. This money was spent for the support of herself and Galen. Plaintiff stated that a good portion of it was spent for Galen's schooling. Of the amount received as alimony, $6,000 has been invested, leaving plaintiff with a balance in cash of between $600 and $800.
Plaintiff testified that she tried to get defendant to take the child during the first and second summers after the divorce, but that he refused, saying he had no place to take her. In the summer of 1950, defendant wrote plaintiff:
"In your letter you mentioned I was supposed to take Galen. If you will read our excellent contract more closely, I believe you will find that I may take her for as much as one month. I understand the intention of this is so she may live with me one month out of the year."
Plaintiff stated that defendant never evidenced any desire to have the child around him. Defendant visited the child whenever his business took him to Washington, probably five or six times the first year, and probably once less the second year. Defendant visited Galen once at the school. Plaintiff stated that defendant never evidenced any desire to take the child from her, and that she first learned he was seeking a change of custody about two weeks before the hearing.
Plaintiff further testified that one of the grounds on which she sought the divorce was defendant's indifference to the child for several years, and that his actions in that respect had been the same since the divorce. Plaintiff said that defendant gave the child a $4 scooter for Christmas one year, and a doll and some puzzles the next year, and that defendant had written his daughter twice in two and one-half years.
Plaintiff also testified that it cost her more than $75 per month to keep Galen; that the cost of living had gone up materially; that the cost of keeping Galen had increased by reason of her getting older; that she could not support Galen on $75 per month, and that the minimum cost would be $175 per month.
Defendant resides in Evanston, Illinois, and is employed by a firm of management consultants. His compensation is $1,000 per month. He has invested about $25,000 in stock of which the market value is about $50,000.
Defendant's firm does work for various large corporations throughout the United States. This work has to do with management problems, such as arise, for instance, upon the purchase of one company by another, *194 or the consolidation of two companies, and the appraisal of property of companies that are being merged. Defendant spends about one-half of his time outside the Chicago area, but is entitled, under his company's rules, to spend the weekends at home unless he is at the time more than one thousand miles from Chicago. Defendant testified that, under this arrangement, he was able to spend most of his weekends at home.
In October, 1951, defendant remarried. His present wife, Marianne, was twentyseven years of age at the time of the hearing. She at one time attended the University of North Dakota, where she studied home economics. She thereafter attended a business college and worked in an office. She was pregnant at the time of the hearing below. Marianne testified:
"I would very much like to have Galen, principally because I think she would be in a home, and I suppose my husband's happiness does come first, and I know that he would be much happier with her. * * * I would like it very much. * * * I am one of a family of nine children, and I have twenty nieces and nephews, all of which I have helped with at one time or another. * * * I taught Sunday School for several years. * * * I liked it very much.
"Q. The problem of a six year old with a small baby, have you considered that? A. Well, I think that possibly we would have to show a great deal of attention to Galen in order not to make her feel left out, but I do think if she were made to feel that she could help with the baby, and the baby was really her brother or sister, it would be a great help. * * *
"Q. Have you ever met the child? A. No."
Since his remarriage defendant and his wife have been living in an apartment in Evanston. The apartment contains a large bedroom with a dressing room, a bathroom, a large living room which is convertible into a bedroom by means of an in-a-door bed, and a kitchen. The apartment is located two blocks from Lake Michigan and there is a large park area alongside the lake. Recreational facilities exist both at the park and the beach.
Defendant testified that since the divorce he has seen his child every time he had an opportunity, which was about six or eight times a year, plus one time he drove to Wilmington to see her. He stated that the last time he saw Galen was approximately six months prior to the hearing; that the child at the time was in her grandmother's apartment; that he had difficulty in seeing the child at the time; that the grandmother told him the child did not want to see him; that the grandmother's "boy friend", who was present, then told the grandmother that it "was ridiculous, that of course the child wanted to see her father"; that he was then permitted to see the child and the child came to him in tears, screaming and completely upset.
Defendant denied that it was not until two or three weeks before the hearing that he requested the custody of Galen. He testified:
"My recollection is that from the beginning the subject of divorce came up, I had plead on my knees to Delores to let me take care of the child. Delores had indicated by her actions that she never wanted the responsibility of that child, and in view of that I have plead with her repeatedly to let me have custody of the child. My sister and her husband have called me on long distance and pleaded with me to plead with her to let them have the child to give the child a proper home until such time as I may arrange a satisfactory living accommodation. For a period of several months my brother and his wife, who have two children of their own, have offered her a home, offered their home as a home for my child. My mother, who is quite aged, has offered to take care of the child. I have repeatedly offered to set up, if I got any assurance of custody of the child, to set up a home that would be suitable for the child. In writing I asked Delores to give me custody of the child within the last six or eight months. * * * She did not answer my letter, though *195 in another conversation by telephone she did tell me she had received that letter."
On cross-examination, defendant testified:
"Q. Mr. Montgomery, in the vacations you told us about, did you make any attempt to see your daughter or have her come visit you? A. I was unable to plan my vacations sufficiently so I could.
"Q. After you were on your vacation, did you make any attempt to have your daughter visit you or go to visit her? A. No."
When asked concerning the letter he wrote to his wife in answer to the one she wrote, in which she mentioned that he was supposed to take Galen for one month, defendant stated: "I had no suitable arrangement for keeping a child for a month."
Defendant further testified that his vacation period is three weeks. His sister, who he testified was anxious to make a home for Galen, lives in Wilmington. On one occasion defendant drove to Wilmington and took the child to the home of his sister and kept her there two days and one night, which was the most extensive visit he had ever had with the child. He further stated that about one-half or three-fourths of the the times when he would call his wife about seeing Galen, she would offer many excuses, but would eventually let him see the child.
Concerning Galen, defendant testified:
"I have a great love for her. * * * I believe the child should be with one of her parents. As soon as I learned Delores had sent the child to school I again tried to get Delores to let her be with me, or bring her back and live with her. Now circumstances are such that I can provide a home and a woman to take care of this girl and I would like very much to have the child live with us. * * * I would like to give my child a home. I will take the money I have and buy a home. That could be a condition by the court, or anything the court desires, if it so desires. I think my child has a right to have a home, and I think to live in the suburbs in a home. I am perfectly willing to provide any living arrangements that are best for the child. * * *
"Q. You would rather see your child living in a home where it may have personal contact with either you or its mother? A. I believe that either would be preferable to this school, where she has contact with neither. I believe for the child to live with me and my present wife in a home where she can give hourly attention throughout the twenty-four hours of the day to the child, there is no necessity for her working, I believe that is far the best arrangement for the child. * * *
"Q. Now, Mr. Montgomery, you have discussed this matter, I know, with your present wife. * * * A. We discussed it before she became my present wife, and her attitude has always been that she would like to provide a home for the child that the child needs. Her attitude toward having a child, with two parents, living away in school most of the year is the same as mine. We both think it is not the thing to do with a young child.
"Q. In other words, she has indicated to you clearly, that having the child live with you would be agreeable to her? A. On many occasions, before and after my recent marriage. * * * My impression of the school is that it has no mothers and fathers in it * * * other than that fact, it is a reasonable place for a child to live. The children sleep in dormitories, as was brought out previously, and have the care of someone who is not their mother or father, which, in my opinion, can never replace the care of a parent."
Appellant urges that the trial court erred in dismissing his motion to modify the original decree, for the reason that the evidence showed such a change of circumstances occurring since the entry of the original decree as to require a change in the custodial arrangements. This allegation of error necessarily calls for an examination and consideration of all the evidence presented.
Preliminary to a decision of the matter, it is necessary to dispose of respondent's contention that we cannot review the *196 evidence taken at the hearing for the reason that appellant failed to file a motion for new trial.
Prior to the adoption of the new Civil Code and Supreme Court Rule 3.23, appellate review in cases of this character was limited to an examination of the record proper where the appellant failed to file a motion for new trial. Olson v. Olson, Mo. App., 184 S.W.2d 768; Donaldson v. Donaldson, Mo.App., 214 S.W.2d 721. But Section 114(d) of the new Civil Code, Laws Mo.1943, page 388, now section 510.310, subd. 4, RSMo 1949, V.A.M.S., applicable to cases tried upon facts without a jury, provides: "The question of the sufficiency of the evidence to support the judgment may be raised whether or not the question was raised in the trial court." And Supreme Court Rule 3.23 expressly excepts, from its requirement that a motion for new trial be filed in order to preserve error, "questions of the sufficiency of the evidence to support the judgment in cases tried as provided by Section 114 * * *." Section 510.310, RSMo 1949, V.A.M.S. See Handlan v. Handlan, Mo.Sup., 247 S.W.2d 715; 1 Carr Mo.Civ.Proc., § 813, p. 880. Hence, in view of the Code provision and Supreme Court Rule 3.23, we are compelled to reject respondent's contention.
Our task in deciding this case is to determine whether there are changes in circumstances which require a change in custody. The test to be applied is stated by this court in Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 126, as follows:
"A provision once made becomes as conclusive as any other order or decree, and can only be modified on a showing of subsequently changed conditions. However there is this to be borne in mindthat while proof of a change in conditions is a prerequisite to the modification of a decree, such proof does not necessarily require a modification, and no modification will be made unless the welfare of the child itself requires a change in the provisions for its custody."
Appellant contends that respondent's placing the child in a boarding school, and the establishment of a home by him upon his remarriage, is such a change in conditions that compel a change in custody. In support of this contention, it is urged that Galen at present is deprived of all parental care; that in appellant's present home Galen would have a room of her own; that appellant's present wife is a college trained young woman of considerable experience in raising and caring for children; that she teaches a Sunday School class; that there are ample recreational and school facilities in the immediate vicinity of their home; that appellant is financially able to provide real home care for the child, with all the necessities and comforts of life; that he has great love for the child; that his moral character is good; and that his present wife has expressed an earnest desire to take care of Galen.
The evidence fails to show that respondent has abandoned all parental care in this matter. It appears from respondent's testimony that as a result of the domestic strife engaged in by these parties Galen was emotionally upset and very unhappy. For this reason, and for the further reason that it was necessary for respondent to secure employment to adequately support herself and the child, respondent, after careful investigation, placed Galen in the boarding school, and most of the cost thereof was paid out of respondent's own funds. During the school term respondent made trips to Wilmington to be with Galen over weekends. She also kept the child in her home during the school vacation periods. Since attending this school Galen has made a complete re-adjustment and, according to respondent's testimony, is completely happy. We do not believe a reasonable inference can be drawn that respondent has abandoned all parental interest in her child.
We will now consider the further contention that Galen would be better off at the home of appellant. In determining this question several considerations stand out in bold relief. In the first place, there is the matter of the parental interest in the child's welfare. It appears from the record in this case that one of the complaints in the divorce petition was that appellant, during the time of his marriage with respondent, treated Galen with indifference. *197 It also appears from the evidence that while appellant would visit the child when his business called him to Washington, he made no effort to be with her during his vacation periods, wrote to her only twice during the two and one-half years subsequent to the divorce, and remembered her in a meager way at Christmas time. It also appears from respondent's testimony that appellant made no objection to the placing of Galen in the boarding school, and made no request for a change in custody until after he was served with respondent's motion for an increase in the amount of support money. While this evidence was denied by appellant, we feel that, as between the parties, respondent's testimony was the more credible.
Nor is the fact that appellant is financially able to provide the child with all the necessities and comforts of life the final test. Under the present arrangement, these are now being furnished in a satisfactory manner. Something else must be shown before we would be warranted in holding that appellant had sustained his burden of showing a change in condition compelling a change of custody.
Does the fact that appellant has remarried and established a new home constitute such a change of conditions as to compel a change in the custodial arrangement? We think not. If the trial court's order were reversed, it would mean, for all practical purposes, that Galen would be taken away from all association with her mother, removed from the school where she is happy, and turned over largely to the custody of appellant's present wife who has never seen the child. We say this, for the reason that the evidence shows that for at least onehalf the time appellant, except for weekends, is on business away from the city of his residence, and the other half of the time he is away from home during each day at his employment. Whether Galen would be better off under this arrangement is a serious question which was, no doubt, carefully considered by the trial court. The trial judge, in addition to hearing the testimony, had an opportunity to observe the mother, the father, and the second wife, and was therefore in a better position to judge of their qualifications than we are with only the transcript before us. He decided that the best interest of the child would be served by leaving her in the custody of the mother. We are not disposed to differ with the trial judge in his ruling. We hold that the trial court did not err in overruling appellant's motion to modify the decree.
Finally, it is urged that the court erred in increasing the amount payable for maintenance because there was no showing of any change in circumstances of the parties since the original decree which would warrant such increase.
There has been a change in conditions since the entry of the original decree which, in our opinion, justified the trial court in ordering an increase in the amount payable for the child's support. It appears from the evidence that at the time of the hearing below the child was two and one-half years older than she was at the time of the original decree, and by reason of that fact her needs had increased. It also appears that respondent, faced with the necessity of seeking employment, was confronted with the problem of either employing help in the maintenance of a proper home for Galen, or of placing her in a boarding school. Respondent chose the latter course as the more satisfactory because, by doing so, not only were the necessities and comforts of life furnished the child, but also her educational needs were provided. This change of circumstances called for an increase in the amount payable to take care of the added expense to which respondent had been put. The amount of the increase ordered by the trial court was approximately equal to this additional expense, and it appears from the evidence concerning appellant's financial condition that said increased payment can be met without difficulty.
The amount to be allowed for the maintenance of a minor child or children is addressed to the sound discretion of the trial court. In exercising this discretion the court must take into consideration the circumstances of each case, such as the ability of the father to pay, the needs of the child, and the means possessed by the mother. The court, in the exercise of its *198 discretion, may make an allowance in excess of the bare necessities of life, if the circumstances warrant. See Prindle v. Dearborn, 161 Misc. 95, 291 N.Y.S. 295, loc. cit. 300, wherein it is stated:
"Children are, as a matter of law, entitled to be maintained in a condition in which their parents are able to maintain them. * * * A parent who has means should not be permitted to limit provisions for his children to a supply of bare necessitiesenough to keep them alive."
We have examined the record in this case and have reached the conclusion that the trial court did not abuse its discretion in increasing the allowance for Galen's support.
The judgment appealed from is affirmed.
BENNICK, P. J., and HOLMAN, J., concur.