250 S.W.2d 837 (1952)
FAGO
v.
FAGO.
No. 28361.
St. Louis Court of Appeals, Missouri.
June 17, 1952.
Claude W. McElwee, St. Louis, Walter Wehrle, Clayton, for appellant.
G. H. Suelthaus, Fred A. Gossom, St. Louis, for respondent.
*838 HOUSER, Commissioner.
This is an appeal from the judgment of the circuit court modifying the provisions of a divorce decree with reference to the custody of Jo-Ann Fago, a child who is now 11½ years of age.
The original decree of April 13, 1949 awarded the custody of Jo-Ann to plaintiff Josephine Ann Fago, her mother, "until the further order of the Court" reserving to defendant Alfred Vincent Fago, her father, the right to visit with the child on every Saturday and Sunday and at all reasonable times "until the further order of the Court." The decree approved and incorporated a stipulation which had been signed by plaintiff and defendant which provided that neither party change the domicile of the child from St. Louis City or County or take her outside the State of Missouri without the written consent of both parties or the permission of the court; that plaintiff would keep her attorney advised as to her domicile; that if defendant desired to exercise his right of visitation, arrangements therefor should be made through counsel as to the place where he might visit the child. The attorney was to have at least one week's notice of the time of such intended visitation.
On December 8, 1950 defendant Alfred Vincent Fago filed an amended motion to modify the original decree alleging that at the time the decree was granted he was residing in limited quarters, was alone and had no way to care for the child; that since the decree was granted he remarried and is living with his present wife in their own home in Long Island, New York, where they have ample room for the child, under good surroundings within an area having good schools and churches, and particularly of the faith of both the plaintiff and defendant; that since the decree the domicile of the child was kept secret and clandestine from defendant, so that he has been unable to determine where she resides; that the child has been removed from attendance at several schools in the City and County of St. Louis, Missouri, and caused to abandon and stop attendance at the church of the faith of the parents; that although defendant has made long and expensive trips from New York to St. Louis for the express purpose of seeing and visiting the child, and has complied with said decree and notified plaintiff's attorney of his intentions to visit the child, nevertheless, his visits with her have been hampered, impaired and shortened by refusal to permit the child to make full visit with him, refusal to permit her to attend a State Fair in Missouri for the child's own pleasure, and by refusing on one occasion to permit him to contact the child to tell her good-bye, "all of which is done for the purpose of influencing said child against this defendant, and to cause her to become estranged from her father and to discourage and make his visitations fruitless and to finally terminate."
Defendant further claimed that plaintiff has neglected the child and failed to properly care and provide for her, and fails to have said child with her but leaves her in the care of other persons, and fails to provide her with proper clothes and wearing apparel in keeping with the station provided by and with the support furnished by defendant.
Plaintiff filed an answer in which she admitted the provisions of the original decree as alleged by defendant but denied other parts of the motion and requested that the award of $15 in the original decree be increased to $18 on account of the increase in the cost of living, and resisted the modification on the ground that defendant had failed to comply with the decree in that he had failed to make nine of the $15 payments required and had threatened to remove the child from plaintiff's custody and from the State of Missouri without the consent of the plaintiff and without a decree of the court. She further alleged that the child was "being well cared for by the Plaintiff and is being properly educated and that all of her necessities are being provided for in a proper manner and that her best interests and welfare require that her custody remain with the Plaintiff."
On May 24, 1951 the trial court modified the original decree by granting to defendant temporary custody of the child from July 1st to August 31st of each year, with the *839 right and privilege of removing the child out of the State of Missouri to the State of New York during that period, and by raising the weekly award to plaintiff for the support of the child while in her custody from $15 to $18.
Plaintiff complains on this appeal of the action of the court in awarding the custody of the child to defendant and the removal of the child from Missouri to New York during the two-month period above described. She contends that there is no substantial evidence of any new facts or changed circumstances affecting the child's welfare so as to require or justify the modification; that the evidence shows that plaintiff and her attorney complied with the decree in so far as the defendant's rights of visitation are concerned; that the only changes which have occurred are the defendant's remarriage and new mode of living, which are not "changed conditions" with respect to Jo-Ann but constituted changed conditions only with respect to defendant and do not authorize the modification of the original decree on the ground of convenience to the father or on any other ground.
Defendant is a naturalized citizen of the United States. He was born in Naples, Italy. He is a free lance commercial artist and photographer who specializes in writing and illustrating children's books. He earns between $5,500 and $6,000 a year. Plaintiff and defendant were married in New York in 1934. Jo-Ann was born in that State and the separation occurred there. Plaintiff was allowed to testify to numerous indignities which she said occurred prior to the separation, and which caused her to be "deathly afraid" of defendant; that he had threatened that plaintiff would never see Jo-Ann againthat he would take her to Italyif he ever got his hands on Jo-Ann; that for two years prior to the divorce defendant had failed to support Jo-Ann and plaintiff; that they had been evicted from their residence at 764 Palmer Road, Bronxville, New York by failure of defendant to pay the rent. After the separation plaintiff came to St. Louis, but according to defendant did not inform him where she was living. She instituted the divorce suit in St. Louis County alleging that defendant was a non-resident of the State of Missouri; that he had absented himself from his usual place of abode and that his address or place of abode was unknown to her. At the time the decree of divorce was granted on April 13, 1949 defendant was living at 120 Parkway Road, Bronxville, New York. He was maintaining a large one-room studio there at the time of the separation. Defendant lived in the studio and there conducted his business of writing stories, making illustrations and doing photography. He took care of the place himself, took his meals out and had no accommodations there for his daughter. On July 16, 1949 defendant married Blanche Hodges who had been previously married and who had two daughters, 13 and 15 years of age. Shortly after his second marriage he purchased a residence at 3 Susquehanna, Great Neck, Long Island, New York, at which place he was residing at the time of the hearing of his motion for modification. The house cost $18,000. Defendant owes about $8,000 on it. This is a 10-room house situated on 1/3 acre of ground, consisting of four bedrooms, four and one-half baths, a living room, dining room, dinette, rumpus room, kitchen and play room. It is equipped with a paint studio, dark room and photography room in which he conducts his business, which requires him to be at home a major part of the time. His stepdaughters reside with him and the present Mrs. Fago. They attend school at Great Neck, about one mile from his house. He drives them to school daily. He maintains a room and bath in that house for the accommodation of his daughter Jo-Ann.
Following the divorce in April defendant arranged to come to St. Louis for a visit with his daughter in July, 1949 and again in the summer of 1950, accompanied each time by his second wife.
On the first trip after reaching St. Louis he went to plaintiff's attorney's office, where he met Jo-Ann. He had not seen her for about three years. When he saw his daughter he "grabbed her and took her into his arms and caressed her and loved her like a father would." She jumped on his lap and hugged and kissed him. Jo-Ann was with her father on each of three days from about *840 9 o'clock A.M. until 6 to 8:30 o'clock P.M. Defendant would meet the child at the attorney's office and return her in the evening to the home of her aunt on Hanley Road in Clayton. These days were spent shopping, sightseeing, going through Forest Park, boating, etc. Defendant testified that he spent $100 for clothing, a doll, and other items for Jo-Ann on this trip. Plaintiff stated that the clothing bought by defendant consisted of a pair of shoes, a cotton dress and a pair of blue jeans. Defendant told his daughter on the third day that he was going to Kansas City and would see her on his return to St. Louis in two days. He advised someone in the attorney's office that he would be back after an interval of two days. On his return he went to the attorney's office but his daughter was not there. He tried unsuccessfully to reach her, finally leaving a message at the attorney's office that he would return the following day at 9 o'clock in the morning for Jo-Ann. The next day the child was in the attorney's office and defendant spent the day with her, returning her at 6 o'clock that evening and then going back to New York. He wrote to his daughter after the July, 1949 trip.
On the trip in August, 1950, having made arrangements with the attorney, defendant appeared at the appointed time at the attorney's office where he found Jo-Ann waiting for him. He testified that he asked the attorney if he could keep the child overnight; that the attorney assented and that when defendant took Jo-Ann home the first night he told her to be prepared to spend the next night with him and his wife at Coral Courts, where he had arranged for a double and a single room. The next morning Jo-Ann came unprepared to stay that night with them.
Defendant wanted to take Jo-Ann to the State Fair at Sedalia. He testified that the attorney saw no reason why he should not take her and that defendant told Jo-Ann to have her grip packed with her clothes in it the next daythat he was going to take her to Sedalia. The next morning Jo-Ann did not have her grip and the inference was plain that plaintiff had refused to permit the child to go with her father. Under plaintiff's version of this incident the child when asked if she wished to go to Sedalia answered in the negative, saying that there was no need to go to Sedalia for "we have the Highlands right here in the city and that is where I want to go."
On the third day of the 1950 visit Jo-Ann was not in the attorney's office when defendant appeared for her. Defendant then went to her aunt's house but no one was there. He telephoned the house but received no answer. He called the uncle at his place of business but he was reported "out of town." He searched for the aunt at two golf clubs, having been informed by the maid that she was taking a golf lesson. Early in the afternoon he called the aunt's apartment and Jo-Ann answered. She was crying. Plaintiff's sister testified that she overheard defendant say that he was going to take her to New York "law or no law" and to get her things packed, and he "didn't give a darn", that he was in a nervous state. Defendant denied this but admitted that he said he "would let the law decide." After the telephone conversation he went immediately to the apartment but when he arrived she was not there. He made fruitless efforts to find her and finally at 7 o'clock P.M., being unable to locate her, he left St. Louis and started back to New York without seeing her. Upon his return to New York he continued to write to his daughter, according to defendant, although plaintiff's attorney testified that defendant had written only five letters during the whole period from the divorce to the modification hearing.
The latter hearing was held on April 6, 1951. Defendant arrived in St. Louis the day before the hearing and without having made arrangements with plaintiff's attorney went to see Jo-Ann at the child's school. He first saw her in front of the school about a block away, walking toward him with another girl. When she was about 100 feet or more distant she saw her father, appeared frightened, darted into an alleyway and ran away from him.
From the time of the divorce decree to the time of the modification hearing defendant was not informed of the address at *841 which his child lived. In April, 1951 she lived with her mother and grandmother at 5464 North Kingshighway in the City of St. Louis. Plaintiff is a dress fitter. Shortly before the modification hearing she returned from a four weeks' vacation trip to Florida during which time Jo-Ann was left with plaintiff's mother. She is self-supporting. Jo-Ann attends the Mark Twain School, where she is regular in attendance, she has outstanding ability in art and does average work in her other studies. Plaintiff's evidence indicated that she is happy, participates in school activities and is accepted by her companions; that her appearance is neat, her clothing adequate and that she is in good health. Jo-Ann and her mother attend the Kingshighway Presbyterian Church regularly where the child attends the Bible Class and sings in the choir. Defendant is a Roman Catholic. He said that his second marriage "had the blessing of a Priest"; that he continues to go to church and lives as a Catholic. Jo-Ann was baptized in the Roman Catholic faith. Her grandmother is at home to receive her after school and before her mother returns from work. In the summer of 1950 Jo-Ann attended an overnight summer camp for two weeks. About three times each week during the summer Jo-Ann stays overnight at her aunt's home. She also stays with her aunt during the Christmas holiday season. Plaintiff claimed that defendant was delinquent in his payments of support money. Defendant denied knowledge of the claim until he arrived for the hearing, whereupon he paid for the weeks she claimed he was delinquent.
It is our duty to review the whole record, with a primary regard for the best interests and welfare of the child, to determine whether the moving party has shown by a preponderance of the credible evidence that there has been a change of facts and circumstances, occurring since the entry of the original decree, sufficient to require a change in the custodial arrangements. In conducting this review we should defer to, and not lightly disturb, the judgment of the trial court. If that judgment, however, is in conflict with a clear preponderance of the evidence and discloses a manifest abuse of judicial discretion this court should direct the entry of the proper judgment under the law and evidence. Fordyce v. Fordyce, Mo.App., 242 S.W.2d 307, loc. cit. 309.
While generally speaking it is against the policy of the law to permit the removal of a minor child to another jurisdiction, the obstacle of non-residence is not an insuperable one and where it is clearly made to appear that the best interests of the child will thereby be subserved, the removal of a child will be permitted. Lane v. Lane, Mo.App., 186 S.W.2d 47; Baer v. Baer, Mo.App., 51 S.W.2d 873, loc. cit. 878. At the time of the original decree it was adjudicated that it was to the best interests of the child that she not be taken out of the State without the consent of both parties and the court. Has defendant sustained the burden of showing new facts and circumstances arising since the entry of the original decree which in the best interests of this child require the entry of a new decree allowing her father to take her out of this jurisdiction and into New York for temporary residence there during the months of July and August in each year? We have concluded that this question must be answered in the affirmative, and that far from demonstrating an abuse of judicial discretion the record reveals an enlightened concern on the part of the trial court for the beneficial growth and development of this child.
While there is no direct evidence of a conscious attempt on the part of plaintiff to influence Jo-Ann against her father, conditions have developed in the administration of the original decree which are leading to that unfortunate result. Because of the great distance from his home in New York, defendant, as a practical matter, has little opportunity in the course of a year to visit with Jo-Ann and by everyday contacts with her to create the normal trust, confidence and affection which a daughter should entertain for her father. She sees him under artificial conditions, in which an effort is made to pack a year's experience into a hectic three-day visit. The remainder *842 of the year Jo-Ann spends with her mother, who professes a genuine and profound fear and distrust of defendant. Plaintiff is "deathly" afraid of defendant. She apprehends bodily harm from him. She testified that she had a "sickening state of mind" from the "constant grind of these terrible things and fear that we have had imbedded into us every day for years." She fears that defendant will abduct the child and take her back to Italy; that if he is permitted to take her out of this jurisdiction she will never see the child again. She testified that "all this trouble" produced in her a nervous heart condition which required the services of a physician. Defendant denied the foundation for these fears and, deferring to the judgment of the trial court, we conclude that plaintiff's fears are unfounded. That fear and distrust, however, exists and this record indicates that plaintiff is communicating and transmitting that fear and distrust to Jo-Ann, whether by design or subconsciously, resulting in an attitude of fear and a loss of affection on the part of Jo-Ann for her father. There is no evidence that plaintiff desires to co-operate in maintaining in the mind of Jo-Ann a wholesome respect for her father. From the time of the divorce decree to the time of the modification hearing defendant was never informed of the address at which his child lived. All his communications with Jo-Ann were of necessity made through the medium of plaintiff's attorney. During each of the visits, in which defendant traveled 1,200 miles to be with his child for a few days, he encountered vexing difficulty at some time or another in making contact with her. On the first visit he was prevented from seeing her for an entire day by reason of failure on the part of plaintiff or her attorney to produce the child at the appointed place. During the 1950 visit defendant was denied the pleasure of having the child stay overnight with him at Coral Courts. Before he had concluded his visit with the child she was intentionally kept away from him and secreted so that he could not tell her good-bye. On the occasion of his third trip, the day before the modification hearing, the child turned and ran with every indication of fright upon the appearance of her father. This represented a complete change from the reception Jo-Ann accorded defendant in July, 1950 at which time she "jumped on him" and hugged and kissed him. This discloses an unhealthy situation which the trial court very properly determined to rectify. Only by practical demonstration that the fears and distrust of the mother, and now of the child, are unfounded can such a feeling be allayed. Jo-Ann, now nearly 12 years old, needs to have the opportunity to learn for herself that she has no reason to fear her father or entertain doubts concerning his love for her. By its judgment the trial court has provided for that demonstration in the home of defendant under normal living conditions, and in so doing properly recognized defendant's rights. Sanders v. Sanders, 223 Mo.App. 834, 14 S.W.2d 458, loc. cit. 463.
The evidence shows that defendant is genuinely concerned with the promotion of the best interests of his daughter. There is no basis upon which to speculate that Jo-Ann's association with her father would be harmful in any sense. "The pleasure an benefit of friendly association with both parents should be accorded to a child". Lambert v. Lambert, Mo.App., 222 S.W.2d 544, loc. cit. 548. She needs to have the benefit of her father's guidance, love and affection as well as that of her mother and grandmother. According to plaintiff's own evidence the child "exceeds in most of the artistic abilities." Her principal and teacher state that "she has outstanding ability in art." What would be more conducive to the development of this talent than an opportunity during the summer months to be associated with her father, who earns his living as an artist? When the divorce was decreed defendant lived in one room and had no facilities with which to care for his daughter, whereas now he has every convenience, comfort and means of normal living to offer her. While such a change in and of itself would not authorize or require a change in the custodial arrangements, it is a factor to be considered in determining *843 whether the trial court abused its discretion.
Appellant claims that the order requires Jo-Ann to "spend her entire vacation under the same roof with a stepmother and two children who are total strangers"; that this might interfere with her development under the guidance and direction of her mother, whom she knows and loves. Appellant cites Schumm v. Schumm, Mo.App., 223 S.W.2d 122. The child in that case was only 6 years oldlittle more than a baby. Jo-Ann, however, is nearly 12 years of age and has developed considerably in her social adjustment since the time of the original decree. Furthermore, in the Schumm case it appeared that the father would be gone all day, whereas in the case at bar the father's business is such that he is at home a major part of the time. That home appears to offer many attractive advantages. The association between Jo-Ann and the present Mrs. Fago during the several days of the 1949 and 1950 visits was "very friendly". The children in the home, although a few years older than Jo-Ann, could add to her enjoyment and pleasure during the summertime periods in her father's house. They are a part of her father's life. Is it not better under the circumstances that the children be given an opportunity to become acquainted and that Jo-Ann share the present Mrs.Fago's children with her father than that they remain total strangers? It will be a broadening and valuable experience for Jo-Ann to spend a part of each summer in the State of New York with her father, leaving ten months of the year for the exertion on Jo-Ann of the beneficient influence of mother, grandmother and aunt in her customary home surroundings in St. Louis. The welfare of the child requires the change in the custodial arrangement ordered by the circuit court and the Commissioner recommends the affirmance of the judgment.
PER CURIAM.
The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.
The judgment of the circuit court is, accordingly, affirmed.
BENNICK, P. J., and ANDERSON and RUDDY, JJ., concur.