Matter of Donald Lee DANSKER, Alfred Steven Dansker, and Marilyn Renee Dansker, Minors, Miriam Dansker, mother of aforesaid children, individually and on the part of said children (Plaintiffs), Appellants,

v.

Eugene DANSKER (Defendant), Respondent.

No. 29189.

St. Louis Court of Appeals.

Missouri.

May 17, 1955.

Lee, Fricke & Lee, John A. Wolf, St. Louis, for appellants.

No attorney for respondent.

HOUSER, Commissioner.

This is an appeal from a decree of the Juvenile Division of the Circuit Court of the City of St. Louis transferring the custody of three previously adjudged neglected minor children from a welfare association to the care of their father.

On July 17, 1951, on the petition of a probation officer the division adjudged the three children of Eugene and Miriam Dansker, then 12, 9 and 7 years of age, respectively, to be neglected children and committed them to the Jewish Child Welfare Association of St. Louis, there to remain until discharged by the court or by due process of law. The father was ordered to pay $70 per month for the support of the children.

On January 4, 1954, Eugene Dansker filed a motion to change the care and custody of the children from the welfare association and place them in his care, alleging that after the commitment, he and the mother of the children were divorced; that he has remarried and is living with his wife in Pratt, Kansas; that he has a large and comfortable home and a sufficient income to properly care for, educate and maintain the children; that he is willing and able to do so and to give the children proper moral and religious training; and that the welfare of the children would be promoted by providing them with a regular home, family life and the love and devotion of parents.

The mother of the children, Miriam Dansker, filed an answer praying that the motion be dismissed, or in the alternative that she be awarded custody of the children, or for their retention by the welfare association, or the relinquishment of the children to the custody of the divorce court. She alleged that Dansker had disregarded his duties as a husband, resulting in a decree of divorce in her favor and that he had failed to pay alimony payments or to provide the children with necessary sustenance, as ordered. Her pleading also alleged that Dansker's present wife had children by a previous marriage and was about to give birth to a child by Dansker, and that it would be detrimental to the best interests of her three children to commingle the children of three marriages in the same home.

Following a hearing a decree was entered on August 18, 1954, terminating the custody of the welfare association and awarding the custody of the three children to Eugene Dansker, with certain visitation privileges allowed their mother and maternal grandparents. From that decree, following an unavailing motion for a new trial, Miriam Dansker for herself and on the part of the three minor children, appealed to this court.

Eugene and Miriam Dansker were married on June 13, 1937. The three children Donald Lee, Alfred Steven and Marilyn Renee were born of this marriage in 1938, 1941 and 1943, respectively. For comparatively short periods of time following their marriage the Danskers lived in Harrisburg, Illinois and Evansville, Indiana. Later they returned to St. Louis where they lived from time to time with the maternal grand-

parents, Mr. & Mrs. David Reiss, who are now 65 and 56 years of age, respectively. The grandparents operate a shoe store and live in nine rooms on the second and third floors of their building on South Broadway. During a part of the time the grandparents paid for the board and clothing of the children. On one occasion Eugene Dansker was sued for non-payment of rent. Records of the welfare association show that application was made for the admission of the children to that home in July, 1950. Dansker testified that on several occasions at which policemen were present he forced Miriam into an automobile on a public street against her will for the purpose of taking her to an institution for mental treatment, including electric therapy, but stated that he did so on the advice of a psychiatrist related to, and paid by, him. Some time prior to 1951 Dansker, who had been working in St. Louis for McDonnell Aircraft Corporation, was transferred to the company plant at Pratt, Kansas. The records of Edgewood Retreat Sanitarium for nervous and psychopathic patients show that Miriam Dansker was admitted in 1949, and in April, 1950 and April, 1951. Miriam Dansker was also in the St. Louis State Hospital for the insane for a period of six months. She stated that her husband's family placed her in these institutions in an effort to discredit her; that although she was emotionally heartsick at the time because her husband had deserted her and the children she was emotionally stable now. The petition in the neglect case, filed June 15, 1951, alleged that the three children were neglected and homeless "in that their mother is mentally and physically unable to care for them." On March 27, 1952, Eugene Dansker filed a divorce suit against his wife Miriam. She filed a cross bill. On September 25, 1952, a default divorce was granted to Miriam on her cross bill, and Dansker was ordered to pay Miriam $25 per week as alimony. On September 27, 1952, two days after his divorce, Eugene Dansker married a divorced woman who had two children, aged 8 and 6, by a previous marriage. In April, 1953, Eu-

gene Dansker ceased making payments of $70 per month to the welfare association for the support of his children, and on September 14, 1953, quit paying alimony to his former wife. On October 16, 1953, Eugene Dansker quit his employment at McDonnell Aircraft and bought a cleaning and pressing establishment in Pratt, Kansas.

Miriam's case history at St. Louis State Hospital shows that at a staff meeting on January 15, 1954, it was decided that the patient should have insulin RX, with possible lobotamy, and that the hospital would recommend that she not have her children. On January 31, 1954, the record shows that her father appeared at the hospital and although advised that Miriam Dansker was mentally ill and in need of further treatment, he disregarded the advice of the medical staff and took her out of the hospital. A memorandum of Dr. Arnold S. Block, a consulting psychiatrist, dated June 23, 1954, recited the following:

"All three children are suffering from a severe neurotic disturbance related to conflicts over disturbed relationships with their parents, and a continued contact with the parents makes the disturbance more severe. It is impossible to make the treatment effective without eliminating all contacts with either of their parents or grandparents.

"I therefore recommend that an order of the Court be requested eliminating all contacts with either parents, either by telephone, mail or personal visitation in order to protect the children from the disturbed anxiety and symptom producing use of these children by two grossly inadequate parents.

"The mother herself has been a patient at the St. Louis State Hospital. She was withdrawn by her parents against medical advice and their records indicate strongly that the mother's influence on the children is a dangerous one."

On the basis of the hopsital records Dr. J. R. Eidelman, who had not personally examined Miriam Dansker, testified that he would agree with the staff diagnosis of January 8, 1954, that Miriam's condition was that of chronic schizophrenia, and gave as his opinion that she was not capable of taking care of her children. Rabbi Abraham E. Halpern, who was acquainted with Miriam Dansker and who personally knew the grandparents and the environment of their home, testified that from a spiritual angle the three children would be in better environment in the home of the mother and grandparents in St. Louis than they would be in the home of their father in Pratt, Kansas, where there is no synagogue, religious school or Jewish environment; that from a religious viewpoint a home in which there were three sets of children from three different marriages, where the father was Jewish and the mother was gentile, would be a "wrong environment." The superintendent of the welfare association testified that on July 1, 1954, he obtained a warrant for the arrest of Eugene Dansker for nonsupport based upon arrearages of more than $1,100 due the association at that time. The grandparents testified that they were willing and anxious to assist the mother of the children in their care and desired to have the court award their custody either to the mother or to them. They expressed genuine interest in the welfare of the children. They have provided them with clothing, allotments, camp expenses, etc., while they have been in the welfare home. The children have been permitted to visit with their mother and grandparents in the home of the latter on Sundays. Both grandparents are active and hold high offices in the affairs of the Jewish Synagogue. Deeply religious, the grandparents desire to rear the children in the Jewish faith. Miriam Dansker testified that she desires the custody of her three children and that with the aid of her parents she will be able to maintain and support them in their home and that she is anxious to have the children properly raised in the Jewish faith. Miriam Dansker works for her parents in the shoe store

for which she receives room and board and $10 a week.

Eugene Dansker, 39, is living with his present wife, Lorene, in a 5-room second floor apartment in Pratt, Kansas. In the home are his present wife's two children by her previous marriage, whom he has been feeding, clothing and housing. He and his present wife have a 4-months old child. He is Jewish and she is gentile. Prior to her marriage she had no particular faith but now she has adopted and is bringing up her children in the Jewish faith. The nearest Jewish Temple is at Wichita, 75 miles from Pratt. The nearest Jewish community is 52 miles from Pratt. Dansker testified that he purchased the cleaning and pressing business for $12,000, paying down $2,000; that he grosses $1,200 and nets about $750 a month from the operation of this business; that during the past eight months his net profits were $6,000; that he has a bank account of $200; that he has a proper home and sufficient income to care for and educate the three children; and that the children would have a happy home life and the environment in his home would be conducive to their welfare.

■■ The first point properly raised in appellants' brief is that the court erred in entering a decree which divests the court of continuing jurisdiction in contravention of the mandatory provisions of Sections 211.010 and 211.120, RSMo 1949, V.A.M.S. Under these sections the jurisdiction of the juvenile court over the person of a neglected child, once having been acquired, continues until the child shall have attained its majority, and orders of commitment made in such case are subject to the further order of the court. But nothing in these sections or in any other section of Chapter 211 RSMo 1949, V.A.M.S., relating to neglected children or in the cases of White v. Held, Mo.App., 269 S.W.2d 125, or Green v. Perr, Mo.App., 238 S.W.2d 924, cited by appellants, prohibits the juvenile court, on a motion to modify its original order, from awarding the custody of a child to a parent who is a non-resident of

the state, or divests the court of continuing jurisdiction if the court permits the child to be taken out of the state. What we said recently in Fago v. Fago, Mo.App., 250 S. W.2d 837, loc. cit. 841, in a proceeding to modify the custody provisions of a divorce decree, applies here:

> "While generally speaking it is against the policy of the law to permit the removal of a minor child to another jurisdiction, the obstacle of non-residence is not an insuperable one and where it is clearly made to appear that the best interests of the child will thereby be subserved, the removal of a child will be permitted. Lane v. Lane, Mo.App., 186 S.W.2d 47; Baer v. Baer, Mo.App., 51 S.W.2d 873, loc. cit. 878."

Although difficulties might be encountered in the administration and enforcement of court orders subsequent to the removal of the children from the state, their removal is not a taking of the children beyond the jurisdiction of the court in the sense that the court thereby loses jurisdiction to change or modify its decree in the future, should subsequent events require it. Conrad v. Conrad, Mo.App., 296 S.W. 196. The decree is not erroneous for this reason.

Appellants make the further point that "the decree is in derogation of the religious faith of the children, in violation of the applicable statutes," citing Section 211.140 RSMo 1949, V.A.M.S. That section, requiring that the juvenile court place children in the care and custody of some individual holding the same religious belief as the parents of the children, has not been violated since both parents of these children subscribe to Jewish religious belief.

Other so-called "Points" raised by appellants are as follows:

"1. The welfare of the children is the controlling consideration in awarding their custody.

"2. Change in custody of minor children, subjecting them to new routines, and different standards of disci-

pline, is undesirable except in cases of necessity.

"3. Parent seeking custody must prove moral fitness."

These abstract statements of law are not allegations of error and present nothing for review under Supreme Court Rule No. 1.08, 42 V.A.M.S. Lockhart v. Lockhart, Mo. App., 271 S.W.2d 208, and case cited. But in view of the fact that the welfare of three innocent children is involved we will review the evidence to determine whether the court erred in transferring their custody from the welfare association to Eugene Dansker, notwithstanding the nonobservance of the rule.

As in the review of orders of modification of custody decrees in divorce suits, Pope v. Pope, Mo.App., 267 S.W.2d 340; Fago v. Fago, supra, we will review the whole record with a primary regard for the best interests and welfare of the children, to determine whether the moving party has shown by a preponderance of the credible evidence that there has been a change of facts and circumstances occurring since the entry of the original decree which, in the best interests of the children, requires modification of the terms of the original custodial arrangement.

Thus considered, it is apparent from the record that movant has not sustained the burden of showing by a preponderance of the credible evidence that there has been such a change of conditions. The fact that Dansker has remarried and has a home to offer the children is not conclusive. It is only one of several factors to be considered in determining whether the trial court abused its discretion. Fago v. Fago, supra. Dansker's record prior to his present marriage, a record of continued failure over the years to measure up to his responsibilities as a father, militates strongly against his present claims upon these children, in the absence of strong and impelling evidence of his repentance and rehabilitation. He deserted them and failed to provide for them in their infancy. He left them home-

less and at the mercy of the public and associated with a divorced woman in another state while still legally the husband of their mother. With full knowledge of his wife's mental incompetence to care for the children properly he permitted them to be adjudged homeless and neglected and to be placed in an institution. His record as a husband was no better than his record as a father. Because of his marital derelictions a divorce was granted to the mother of the three children, who was found to be the innocent and injured party. Thus by two court decrees, one of which divorced him from his wife and the other of which legally separated him from his children, his marital and parental unfitness in the past were judicially established.

Movant has not sustained the burden of proving his repentance and rehabilitation by strong and impelling evidence. The testimony of Eugene and Lorene Dansker concerning the favorable aspects of their home in Pratt, Kansas, and of his ample ability, financially and otherwise, to support, educate and maintain these children in a happy environment is not corroborated or substantiated in any manner whatsoever. There are numerous incongruities in their testimony which cast doubt upon their credibility. Dansker testified that financially he was in a position to care for the added burden of three children; that he has a $5,000 equity in his business. His lawyer, however, withdrew from the case, filing an affidavit in this court showing that Dansker advised him that he had no funds with which to pay an attorney's fee or the costs of printing a brief. No brief has been filed here in his behalf. Dansker testified that he had a bank account at the time he answered written interrogatories, but in his answers to the interrogatories under oath he stated that he had no bank account. He testified that he could settle the delinquent account of $1,100 with the welfare association "at this time," in contradiction of his further testimony that he had only $200 in the bank and had no cash, stocks, bonds, real estate, etc. In the same breath he said he could settle this bill "in a month or two." Three times he testified that the cleaning

and pressing business cost him $1,200 and then he testified that it cost $12,000. Lorene first testified that she knew her husband two years before she married him and then stated that she meant her former husband. In any event, she conceded that she associated with Dansker about six months before she married him.

▇▇▇ Now that he seeks to have the legal barrier between him and his children removed his morals are a factor to be considered. Link v. Link, Mo.App., 262 S.W.2d 318. While there is no evidence of specific acts of misconduct in his relations with Lorene it is clear that Eugene Dansker associated with her for at least six months and perhaps as long as four years prior to his divorce from Miriam. When first questioned as to the length of time he went with his present wife he testified: "I went with the young lady for four years before we got married. *What difference does that make?*" When the significance of this statement dawned upon him Dansker repudiated it and said that he meant that he had gone wih his *former* wife for four years. Whether it was four years or six months, as Lorene finally testified, we can safely say that the parties were well acquainted with each other at the time of Dansker's divorce from Miriam, for it is a matter of record that he and Lorene were married two days after that divorce was granted.

Movant began to support his new wife and stepchildren but six or seven months after his second marriage he quit sending support money for his own children and a short time thereafter abandoned any further alimony payments to his former wife. At the time of the hearing of the instant motion he was arrested for nonsupport, then being more than $1,100 in arrears on the payments due for the support of the children in whom, at the hearing, he professed such a sincere interest.

The unpromising spiritual factor is an important consideration. At the welfare home the children are provided with the religious and educational advantages of their own creed, which would be wholly lacking in Pratt, Kansas, except to the

extent that the principles of the faith could be instilled by the father and a converted gentile stepmother.

Nor is the physical situation such as to recommend the placement of these three children in the Eugene Dansker home. Crowded into a second story 5-room apartment there would be two adults and six children, the offspring of three different marriages, ranging in ages from a few months to 16 years. Pratt, Kansas, is a small community, removed 500 miles from the metropolitan center which was the scene of the birth and childhood of these children. To them the surroundings would be strange, with no synagogue closer than 75 miles.

The medical report indicates that the three children are suffering from a severe neurotic disturbance; that they cannot be effectively treated unless all contacts with both parents are eliminated. In it both parents are described as "grossly inadequate."

■ Under these circumstances, to take these children from the welfare home in which they have the benefit of medical and psychiatric service in a religious atmosphere and place them in the home of a father who has written a record of dereliction and failure in connection with their care would be to take risks with their future which should not be assumed by a court. Such an experiment should not be permitted. These considerations, along with the general policy of the law which does not permit the removal of minor children to another jurisdiction except upon a clear showing of benefit, lead us to the considered conclusion that the court abused its discretion in awarding custody to Eugene Dansker.

■ From this record it is equally clear that at this time the mother is not in a position to care for these children; that there has been no change of conditions justifying a modification in her favor, and that an order awarding custody to her would be inadvisable.

The welfare of the children will best be promoted by permitting them to remain in the custody of the welfare association. The Commissioner therefore recommends that the decree appealed from be reversed and the cause remanded to the Juvenile Division of the Circuit Court of the City of St. Louis with directions to overrule the motions of both parents for change of custody.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The decree appealed from is, accordingly, reversed and the cause remanded to the Juvenile Division of the Circuit Court of the City of St. Louis with directions to overrule the motions of both parents for change of custody.

MATTHES, Acting Presiding Judge, and DOUGLAS L. C. JONES and WILLIAM R. COLLINSON, Special Judges, concur.