Evelyn Sue Wooden GRAVES, Plaintiff-Respondent,

v.

Glenn WOODEN, Defendant-Appellant.

Nos. 7457, 7461.

Springfield Court of Appeals.

Missouri.

June 11, 1956.

Rogers & Rogers, Gainesville, for defendant-appellant.

Hogan & Hogan, Richard D. Moore, West Plains, for plaintiff-respondent.

STONE, Judge.

On October 5, 1951, plaintiff, then Evelyn Sue Wooden, was granted a divorce from defendant (on grounds not disclosed in

the transcript) in the Circuit Court of Howell County, Missouri, and was given custody of Dyana Kay, then eight years of age, the only child born of the marriage. There was no award of alimony or child support and no mention of visitation or divided custody. By his motion to modify filed on September 18, 1954, defendant sought custody of the child on account of changed conditions subsequent to the original decree. On separate appeals here consolidated, defendant complains (a) of the judgment entered on February 9, 1955, overruling his motion to modify and directing his payment of an attorneys' fee of $200 to plaintiff, and (b) of the judgment entered on May 31, 1955, directing defendant to pay an additional attorneys' fee of $250 to plaintiff on appeal.

■ With respect to the issue raised by defendant's motion to modify, our duty on appeal is to review the entire record with primary regard for the regnant principle that the welfare of the child is of paramount and controlling importance [Pope v. Pope, Mo.App., 267 S.W.2d 340, 343(3); Mayo v. Mayo, Mo.App., 244 S.W.2d 415, 416(1); Garvey v. Garvey, Mo.App., 233 S.W.2d 48, 50(2)] and to determine whether the moving party, in this instance defendant, has carried his burden of showing by a preponderance of the credible evidence [Armstrong v. Armstrong, Mo.App., 185 S.W.2d 845, 847(6); Morgens v. Morgens, Mo.App., 164 S.W.2d 626, 632(3)] changed facts and circumstances which, in the best interests of the child, require modification of the custodial provisions of the original decree. Montgomery v. Montgomery, Mo. App., 257 S.W.2d 189, 196(2, 3); Davis v. Davis, Mo.App., 254 S.W.2d 270, 272(1). The morals of the respective parents are in every such case a proper subject of inquiry and become in the instant case an exceedingly important and persuasive factor. Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 74(4); Dansker v. Dansker, Mo.App., 279 S.W.2d 205, 210(7); Link v. Link, Mo.App., 262 S.W.2d 318, 321(4); Rex v. Rex, Mo.App., 217 S.W.2d 391, 394.

For about two years prior to their separation (on a date not shown but "not long" before the divorce), plaintiff and defendant had resided in Murray, Kentucky, where they had established a shoe store managed by defendant. As a result of their property settlement, defendant (having assumed all financial obligations in connection therewith) became the sole owner of the shoe store and of the family residence in Murray. After the divorce in October, 1951, plaintiff and Dyana lived in an upstairs three-room apartment in West Plains until the Fall of 1953 when they moved into a small house near the school then attended by Dyana. At the close of the school year in May, 1954, plaintiff stored her household furniture and "stayed part time at my mothers" in West Plains. Dyana went to her father in Murray, where she had spent three weeks during the Summer of 1952, the entire Summer of 1953, and her Christmas vacations in 1952 and 1953. When defendant returned Dyana to West Plains the day before school started in September, 1954, he "got an earful" about plaintiff and the motion to modify followed shortly.

As developed in examination of plaintiff herself at the hearing on February 9, 1955, she had, about January 15, 1953, met one Rex C. Graves, a married man (apparently estranged from his then wife although this is not shown clearly) who had some cabins and "a tavern selling beer and meals" at Tecumseh, a small country community in Ozark County, Missouri. After meeting Graves, plaintiff "made frequent visits" to Tecumseh. She conceded that she "possibly" had been there "about every weekend" and admitted that she had stayed overnight, "sometimes Saturday and Sunday." In reply to the pointed inquiry as to whether she "did spend nights with Mr. Graves," plaintiff assured the court and counsel that "we had adequate sleeping arrangements, his mother was there." However, neither Graves nor his mother testified; and, whatever the "sleeping arrangements" were and however "adequate" (in plaintiff's concept of that term) they may have been, she was pregnant when she married Graves on August 24, 1954 (about one week after he was divorced), and she gave birth to a

daughter (two months prematurely, as she explained) on November 23, 1954.

While on her weekend trips to Tecumseh, plaintiff left Dyana with plaintiff's mother in West Plains; and, after defendant returned Dyana at the end of the summer vacation in 1954, she lived with her grandmother in West Plains until January 3, 1955, when the child was withdrawn from school there and was taken into the home occupied "the middle of November," 1954, by plaintiff, Graves and their infant daughter, which was located on a five-acre tract about 2¾ miles east of Gainesville. At the time of the hearing on February 9, 1955, Dyana was attending school in Gainesville, riding a bus to and from school. Graves then was operating "a business in Gainesville" where "he sells beer only"—"no meals." Dyana had attended Sunday School in West Plains "as regular as average" but not since "about the middle of November," 1954. When taken with her testimony as a whole, plaintiff's *unconfirmed* statement that, after the child's removal to Gainesville, "I (plaintiff) am seeing she attends church," lacks the "naturally compelling ring of sincerity" [Clemens v. Clemens, Mo., 235 S.W.2d 342, 346] and leaves us unconvinced.

Turning to defendant, we find persuasive evidence of his commendable and continuing concern for Dyana's welfare. Shortly after the divorce, defendant began to send $25 per month to Dyana, most of which was deposited in Dyana's bank account "to use when she saw fit," and also "cash trying to average each week spending money." While Dyana was with defendant in the Summer of 1952, he clothed her for the coming school year and told her "any time she needed necessities I would like to know about it." On December 14, 1952, defendant married his present wife, Mrs. Jessie Frances Wooden, formerly of Shelbyville, Tennessee, a woman not previously married who, as the oldest of six children, had "helped raise the younger five" after "we lost our mother." Since her marriage to defendant, the present Mrs. Wooden has "made practically everything" for Dyana, who is hard to fit with "ready made clothes" because "she is short waisted" and above average in weight. During the four periods Dyana has been with defendant and his present wife in Murray (i. e., the Christmas vacations in 1952 and 1953 and the entire summer vacations in 1953 and 1954), Dyana and her stepmother "got along fine." The child evidenced affection for her stepmother who, in turn, emphatically stated at the hearing that "I do as much for her (Dyana) as if (she were) my own child" and that, if defendant were given custody of Dyana, the stepmother would welcome the child into the Wooden home and would treat her as a daughter.

Defendant (now 38 years of age) and his present wife (now 36 years of age), to whom no children have been born, reside in a modern seven-room dwelling, which is only three blocks from school and six or seven blocks from the church attended by the Woodens, where defendant is treasurer of the Sunday School, teaches a class of young boys, and is the assistant training union director, and where his wife is superintendent of the primary department in Sunday School and group leader of the junior department in Training Union. The testimony (by depositions) of four residents of Murray, namely, the president and the "agricultural representative" of the bank, the proprietor of a restaurant, and the minister of music at the church, adequately establishes that defendant's "financial affairs are good, both from the business and personal standpoint," and that he and his present wife are of unimpeachable reputation and character.

As we undertake the unwelcome and unpleasant task of determining which parent should be awarded custody of Dyana, we are deeply conscious of the finite limitations imposed by human frailty and fallibility upon courts, counsel and parties alike, and we are profoundly impressed with the heavy responsibility and grave solemnity attendant upon discharge of our duty bearing upon the sacred relationship between parent and child, involving the future course of a precocious and innocent

girl, and perhaps influencing the eternal destiny of an immortal and unexpendable soul. We agree with plaintiff that the custody of a child should not be awarded with any thought of gratifying the wishes of, or meting out punishment upon, either parent [Long v. Long, Mo.App., 280 S.W.2d 690, 694(4); Green v. Perr, Mo.App., 238 S.W.2d 924, 927(1)]; and, notwithstanding the fact that Dyana did not testify and her parental preference (if any) is not indicated, it may not be amiss to add that a child's wishes, although entitled to consideration, are not to be indulged if they are inconsistent with attainment of the paramount objective, i. e., furtherance of the child's welfare. Fordyce v. Fordyce, Mo. App., 242 S.W.2d 307, 313–314(2); Wells v. Wells, Mo.App., 117 S.W.2d 700, 705 (16–18); Hartman v. Hartman, Mo.App., 277 S.W. 950, 951–952(1).

■ We also recognize that, as plaintiff's counsel remind us, a mother's prior transgression of the moral law does not *necessarily* require that she be denied or deprived of custody of her child. Johns v. McNabb, Mo., 247 S.W.2d 640, 643. But, we are *not* here confronted with the alternative of awarding custody either to aged and enfeebled great-grandparents or to a mother whose prior misconduct is explained by "a relentless series of unfortunate mitigating circumstances" and as to whom "the proof is positive and the inferences strong" that both she and her present husband "have fully realized the mistakes they have made and fully repented of them", as was the situation in Ex parte Ferone, Mo.App., 267 S.W.2d 695, 700; and, our choice is *not* between a father who, believing his wife to have been unfaithful, nevertheless attempted "to contract away his child," was more concerned about his property than he was his daughter, and altogether was "far from being an attractive personage", and a mother whose prior misdeeds, attributed to "a passion weakly resisted, and suffered to grow and ripen by the fatuous conduct" of her husband, might be regarded as a single transgression, as in Knepper v. Knepper, 139 Mo.App.

493, 122 S.W. 1117, 1118. On the contrary, plaintiff's own testimony in the instant case convicts her of "adulterous conduct (which) was shameless, gross, and coarse" [Smith v. Smith, 192 Mo.App. 99, 180 S.W. 568, 570], presents no "strong and impelling evidence of * * * repentance and rehabilitation" on the part of either herself or her present husband, who was in absentia at the hearing [Ackermann v. Ackermann, Mo.App., 280 S.W.2d 425, 427; Dansker v. Dansker, Mo.App., 279 S.W.2d 205, 209], and demonstrates that she has long since forgotten that the price of a virtuous woman "is far above rubies" [Proverbs 31:10] and that, "as a jewel of gold in a swine's snout, so is a fair woman which is without discretion." Proverbs 11:22.

We have not overlooked Dyana's excellent school record in West Plains where she was in the upper ten to fifteen per cent of her class, or the fact that, when defendant came to take the child at vacation periods, she always appeared "to be well kept." But, Dyana's good health and scholastic progress (important as they are) will become empty, hollow and meaningless unless they are complemented and crowned by the inculcation of high ideals, the development of good character, and the preservation of decency, morality and virtue. The record in the instant case leaves no room for doubt but that defendant (and his present wife) would strive diligently to "train up (Dyana) in the way (she) should go" [Proverbs 22:6], whereas the leaving of Dyana with plaintiff necessarily would involve a not inconsiderable risk that the child might tread the same primrose path, seek the same fleshpots, and indulge the same lusts as plaintiff, for it is a timeless truth that "as is the mother, so is her daughter." Ezekiel 16:44.

Since both parents have remarried, the attitude of their present spouses toward Dyana and with respect to her being brought into the home is also an important factor to be considered, and the utter absence of any indication as to Graves' disposition or feeling toward Dyana may be

significant. Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 781. Consult also In re Krauthoff, 191 Mo.App. 149, 177 S.W. 1112, 1120; Lane v. Lane, Mo.App., 186 S.W.2d 47, 48. Furthermore, the birth of an infant daughter to plaintiff and her present husband would make Dyana "clearly and definitely" a stepchild in Graves' mind and "could have a similar effect with plaintiff." Watkins v. Watkins, Mo.App., 230 S.W.2d 778, 783.

Although, generally speaking, it is against the policy of the law to permit removal of a child to another jurisdiction [State ex rel. Shoemaker v. Hall, Mo., 257 S.W. 1047, 1054; Green v. Perr, supra, 238 S.W.2d loc. cit. 928(5)], the objection of non-residence must give way to the overriding consideration of the child's welfare [Fago v. Fago, Mo.App., 250 S.W.2d 837, 841(3); Lane v. Lane, supra, 186 S.W.2d loc. cit. 50(3)]; and, by awarding custody to defendant with permission to take Dyana to Kentucky, the Circuit Court of Howell County would not divest itself of continuing jurisdiction to modify the custodial provisions of the decree [Conrad v. Conrad, Mo.App., 296 S.W. 196, 198(7); Middleton v. Tozer, Mo.App., 259 S.W.2d 80, 88(11)—cf. State v. Pogue, Mo.App., 282 S.W.2d 582, 589(16)] upon satisfactory proof of changed conditions prior to majority of the child or the death of one of her parents, whichever first occurs. Hayes v. Hayes, 363 Mo. 583, 252 S.W.2d 323, 327(5); In re Wakefield, Mo.App., 274 S.W.2d 345, 347(5); Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 125(1).

In a case of this character, we should be and are inclined to defer to the findings of the trial court where sharply conflicting evidence does not preponderate one way or the other. Lockhart v. Lockhart, Mo.App., 271 S.W.2d 208, 212–213(3); Kinder v. Kinder, Mo.App., 267 S.W.2d 356, 359(4); Luckett v. Luckett, Mo.App., 263 S.W.2d 41, 44(4); Hawkins v. Hawkins, Mo.App., 250 S.W.2d 817, 819(2). However, the reason for the rule in large measure fails where, as here, there is no material conflict in the testimony [Schulte v. Schulte, Mo., 140 S.W.2d 51, 54(8); Shilkett v. Shilkett, Mo.App., 285 S.W.2d 67, 72(8)]; and, in any event, it is our duty, upon this review de novo, to determine the right and justice of the matters in controversy. Hurley v. Hurley, supra, 284 S.W.2d loc.cit. 75(8); Dagley v. Dagley, Mo. App., 270 S.W.2d 553, 556(2). Reluctant as we are to disagree with the capable and conscientious trial judge, appellate review would become an empty formality [Prudot v. Stevens, Mo.App., 266 S.W.2d 756, 758] and we would be unworthy of the trust reposed in us, if we yielded our firm convictions simply because he, with an equal sense of justice, found differently. Campbell v. Campbell, Mo.App., 281 S.W.2d 314, 319, and cases there cited.

Although cognizant of the natural bond between a mother and her child, we nevertheless must heed the cautionary injunction that our decision must not be predicated on sentiment and sympathy [In re Krauthoff, supra, 177 S.W. loc:cit. 1123; In re Steele, 107 Mo.App. 567, 81 S.W. 1182]; and, although mindful that, in resolving this issue of custody arising out of the tragic ruin of another broken home, we could not render a decree which would not engender sorrow and grief in some interested person, the thought "that we are in no way responsible for the causes which have unhappily brought about the situation with which we are confronted" affords some slight comfort and prompts us to repeat, "Let those whose hearts are wrung remember this when, in their pain and tears, they realize the effect of this decree." In re Krauthoff, supra, 177 S.W. loc.cit. 1113. "(W)ith an eye single" [Tatum v. Davis, 144 Mo.App. 125, 128 S.W. 766, 767] to the future welfare of Dyana [Wilson v. Wilson, supra, 260 S.W.2d loc.cit. 782(16); Abel v. Ingram, 223 Mo.App. 1087, 24 S.W. 2d 1048, 1050(6)], our duty upon the record before us is so clear, cogent and compelling that, however unpleasant, it may not be evaded, eluded or escaped and is not to be shunned, shifted or shirked. The care, custody and control of Dyana should

be awarded to defendant. Watkins v. Watkins, supra, 230 S.W.2d loc.cit. 783–784(4, 5); In re Steele, supra.

The allowances of attorneys' fees of $200 for services in the trial court and of $250 for services on appeal are undoubtedly reasonable and proper in amount (on the record here presented), and plaintiff's able and resourceful counsel, who have made the best of a bad (from their standpoint) situation, should receive adequate compensation. However, it does not follow that their fees should be paid by defendant. It has long been settled, beyond room for argument, that the broad discretion of the trial court in the making of such allowances is to be exercised in the light of the wife's necessities and the husband's ability to pay. Price v. Price, Mo.App., 281 S.W.2d 307, 313(17); Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 437 (12); Padgett v. Padgett, Mo.App., 231 S.W.2d 207, 211(5); Dietrich v. Dietrich, Mo.App., 209 S.W.2d 540, 545(10); Weber v. Weber, Mo.App., 189 S.W. 579(1). Of course, each case must be determined on its own facts [Summers v. Summers, Mo. App., 222 S.W.2d 514, 520; Robertson v. Robertson, 137 Mo.App. 93, 119 S.W. 533, 534], and a wife need not be reduced to a state of destitution to merit allowances. Consult Whitwell v. Whitwell, 318 Mo. 476, 300 S.W. 455, 456(5); Rush v. Rush, Mo. App., 284 S.W.2d 53; Harriman v. Harriman, Mo.App., 281 S.W.2d 566, 572; Gregg v. Gregg, Mo.App., 272 S.W.2d 855; Richardson v. Richardson, Mo.App., 270 S.W.2d 68, 72(7); Bender v. Bender, 190 Mo.App. 572, 176 S.W. 284. But, it is clear that, in the final analysis, the test as to whether such allowances should be made is whether the wife is possessed individually of sufficient means, to which she may reasonably be required to resort [cf. Hopkins v. Hopkins, Mo.App., 260 S.W.2d 833, 835(4, 5); Patterson v. Patterson, Mo.App., 215 S.W. 2d 761, 767(10); Davis v. Davis, 174 Mo. App. 538, 160 S.W. 829, 830], and with which she may adequately prosecute or defend the pending action, as the case may be. Arnold v. Arnold, Mo., 222 S.W. 996, 1001(12); Price v. Price, supra, 281 S.W.

2d loc.cit. 313(17); Lehr v. Lehr, Mo.App., 264 S.W.2d 37, 39(1); Baer v. Baer, Mo. App., 51 S.W.2d 873, 880(14); Rutledge v. Rutledge, 177 Mo.App. 469, 119 S.W. 489. See also Noll v. Noll, Mo.App., 286 S.W.2d 58, 61(6); Summers v. Summers, supra, 222 S.W.2d loc.cit. 520(6).

In the case at bar, *plaintiff* testified that she owned stocks valued by her at $78,200. (She had been employed from October, 1951, to July, 1954, by one of the corporations whose stock she owned, "as a statement clerk" at $30 per week.) The record shows that dividends are being paid on those stocks although the precise amount of such dividends is not revealed. Plaintiff's only reference to debts was, "I still owe some notes incurred from the divorce action—I think the debts now are $4,-000 * *." The *undisputed* evidence as to *defendant's* financial worth and earnings was that he owned his home in Murray, Kentucky, purchased "on payments" in 1949 for $6,500 (whether clear at the time of hearing was not shown); that the net worth of his shoe store was between $4,000 and $5,000 (the difference between assets of $11,000 to $12,000 and liabilities of $7,000); that his bank account varied between $1,000 and $3,000; and, that his net income during the year prior to the hearing was between $4,000 and $5,000. So, plaintiff (now remarried and thus no longer needing dividends for her personal support), having fixed her own net worth at about $74,200, seeks allowances for attorneys' fees from defendant whose net worth is, as best it may be estimated from the transcript, between $11,500 and $14,500. We are cited to no case, and our independent investigation reveals none, in which allowances for attorneys' fees have been made to a wife under analogous circumstances; and, considering her requests in the light of her necessities and defendant's ability to pay and measuring them by the approved test stated above, we think the conclusion inescapable that the allowances should not have been made.

Accordingly, the judgments entered on February 9 and May 31, 1955, are set aside, and the cause is reversed and remanded

with directions to enter a judgment and decree (a) sustaining defendant's motion to modify, (b) awarding the care, custody and control of Dyana Kay Wooden to defendant (excepting only for and during the periods hereinafter specifically set forth) with permission to take the child to defendant's home in Kentucky, (c) awarding the care, custody and control of Dyana to plaintiff (1) for and during the period of one week from 6 P.M. on the first Monday in July (during 1957 and each succeeding calendar year) to 6 P.M. on the second Monday in July, Dyana to be transported to and returned from plaintiff's home on each such occasion pursuant to defendant's arrangement and at his expense, and (2) for and during the period of one week from and after 9 A.M. on each December 26th hereafter (unless the school then being attended by Dyana shall reconvene prior to expiration of such period of one week in which event plaintiff's custody shall terminate and Dyana shall be returned to defendant's home on or before 9 P.M. on the Saturday preceding the reconvening of school), Dyana to be transported from and returned to defendant's home on each such occasion pursuant to plaintiff's arrangement and at her expense (all of the foregoing to be subject to the further orders of the Circuit Court of Howell County, Missouri, in the proper and lawful exercise of its continuing jurisdiction and power to modify the custodial provisions of the original decree), and (d) denying plaintiff's motions for allowances of attorneys' fees for services in the trial court and on appeal.

McDOWELL, P. J., and RUARK, J., concur.